REVISED SEPTEMBER 27, 1999

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

No. 98-60590

————————

### WILLARD RUSHING and PATRICIA RUSHING,

Plaintiffs-Appellants,

VERSUS

### KANSAS CITY SOUTHERN RAILWAY COMPANY,

Defendant-Appellee.

————————

Appeal from the United States District Court
for the Southern District of Mississippi

————————

August 30, 1999

Before KING, Chief Judge, SMITH and
BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Willard and Patricia Rushing appeal the dismissal of their nuisance action brought against Kansas City Southern Railway Company ("KCS"). Concluding that the district court took an over-expansive view of federal preemption and overlooked genuine issues of material fact in entering summary judgment for KCS, we reverse and remand for further proceedings.

I.

According to the summary judgment record, the Rushings purchased their home along KCS's "main line" railroad track, where trains passed by only a couple of times each day. In 1996, however, KCS built a switching yard located about fifty-five feet from the Rushings' property. The yard, a vital part of KCS's successful operations, serves as a "hub" for attaching and detaching rail cars to position them in sequence to travel to various sites around the country. Allegedly, the switching operations necessarily, and perhaps excessively, produce various noise and vibration emissions. Specifically, the noise and vibrations come from (1) cars colliding together to couple, (2) rail cars in motion, (3) stationary and passing locomotives, and (4) locomotive whistles.[1]

———————————

[1] Even though trains no longer use whistles, we use the term "whistles," as do the parties, to refer to air horns and other audible warning devices.

As part of the switchyard project, KCS built a large earthen berm, topped with an acoustical noise barrier, to mitigate the noise emissions that might disturb area residents. The Rushings allege that the berm has failed to eliminate the noise and does nothing to stop the vibrations. After KCS began using the switchyard, they claim to have experienced "physical symptoms, anxiety, deteriorating health, etc., resulting from the constant vibration, exceedingly high noise, and violent shocks coming from the rail yard." The shocks and vibrations also allegedly have caused their home to shift and crack.

## II.

The Rushings sued suit in state court, alleging a common law claim that the switchyard was a private nuisance.[2] KCS removed to federal court on the basis of diversity jurisdiction. In an amended answer, KCS pleaded the affirmative defense of preemption.

In its initial pre-discovery disclosure, KCS indicated that Dr. Michael Seidemann was an industrial audiologist, expected to testify on sound measurements, taken both in the past and possibly in the future, of noise levels at the switchyard, to establish that the sound emissions originating in the yard complied with federal regulations promulgated pursuant to the Noise Control Act ("NCA"), 42 U.S.C. § 4901 *et seq*. The regulations promulgated under the NCA, codified at 40 C.F.R. § 201.1 *et seq*., set maximum decibel ("dB") levels for train operations and provide the procedures to follow in conducting sound-level testing to establish NCA compliance.

Over the Rushings' objection, the magistrate judge granted KCS's motion to allow Seidemann to measure sound levels on the Rushings' property, to determine whether they complied with the federal regulations central to the preemption defense. Seidemann conducted his tests in conformity with NCA regulations during one evening, in the Rushings' presence. KCS timely designated Seidemann as an expert witness and served the Rushings with a copy of his "Expert Witness Report" pursuant to FED. R. CIV. P. 26(a)(2)(B). The report detailed the testing conducted, the methods employed, and the results.

KCS moved for partial summary judgment on the claims for excessive noise and vibrations. It asserted that the NCA preempted the noise claim stemming from rail car coupling activity; that the Federal Rail Safety Act of 1970 ("FRSA"), 49 U.S.C. § 20101 *et seq*., preempted the claim based on whistle blowing; and that, per Mississippi tort law, the noise and vibrations complaints were not actionable under a private nuisance theory, because KCS's operation of the switching yard is a public function.

KCS supported the NCA preemption claim with an affidavit from Seidemann, describing himself as "a forensic audiologist, licensed in audiology by the Mississippi Council of Advisors in Speech Pathology and Audiology." The affidavit also attested that Seidemann had conducted his tests from points on the Rushings' property with the prescribed equipment, properly calibrated to ensure accuracy.

Seidemann conducted his tests in two-hour shifts and measured a minimum of thirty car couplings during each shift, as required by the regulations. The affidavit explained that he tested noise emissions originating from (1) rail cars in motion, (2) car couplings, (3) stationary locomotives, and (4) passing locomotives. He concluded that the noise emissions fell within the decibel limits established by the NCA regulations.

In response, the Rushings filed a document entitled "Material Facts in Issue." They

---

[2] In their brief, the Rushings claim that they also allege negligence. KCS correctly points out that they do not. If, however, KCS implies that the Rushings fail to state a nuisance claim by failing to allege negligence, it is mistaken. *See*, *e.g.*, *McFarlane v. Niagra Falls*, 150 N.E. 391, 391 (N.Y. 1928) (Cardozo, J.) ("Nuisance as a concept of law has more meanings than one. The primary meaning does not involve the element of negligence as one of its essential factors.").

claimed factual disputes existed related to Seidemann's qualifications to make the "assertions" contained in his affidavit, the conditions under which he tested, and his conclusion that the noise and vibrations fell within the NCA's limits.

As evidence, the Rushings submitted only affidavits executed by them in which they both claimed that the noise levels and activity on the night Seidemann took his measurements were much lower than normal. They also attested that the trains operated in a different manner than usual that night, such as not getting running starts and not coupling multiple cars at the same time. In addition, they claimed that the trains usually sounded their whistles excessively, and often with no apparent purpose.

Twelve and fourteen days later, respectively, without seeking or securing the court's permission, KCS filed two "supplements" to its summary judgment motion. The first contained a copy of Seidemann's FED. R. CIV. P. 26 report that it previously had sent to the Rushings. Accompanying the report was Seidemann's *curriculum vitae* ("CV"). The second included another copy of his CV and an affidavit in which Seidemann emphasized his qualifications. KCS refers to these submissions as rebuttal evidence.

A month later, the Rushings moved to supplement their response with an affidavit from an employee of Employment Health Services ("EHS"), a company with expertise in environmental noise, explaining the results of their own tests. EHS measured sound levels inside the house at a weighted sound level of 105dB, easily exceeding the 92dB permitted by the NCA regulations for coupling activities. *See* 40 C.F.R. § 201.15.

The motion explained that the Rushings were not wealthy, and the testing was rather expensive. "It was not until they read the Railroad's position that relied upon Seidemann's measurements that did not comport with the conditions in which they lived, that they decided that they would spend the money to employ someone to perform similar measurements of the noise levels that exist under conditions consistent with those in which they actually lived." The motion indicated that supporting affidavits could be filed and that the supplementation would not delay the trial that was over one hundred days away. KCS opposed the motion, arguing that the supplementation was untimely and that the Rushings had failed to designate an expert witness within the ordered time.

The court granted KCS's motion for partial summary judgment based on its affirmative defenses, reasoning that the NCA preempts the nuisance claim insofar as it is based on noise related to the switching activities, relying on Seidemann's affidavit attesting that the noise levels he measured fell within the applicable regulatory maximums. The court also held that the NCA preempts the claim related to vibrations, because there is a direct correlation between the vibrations and the noise, and they stem from the same regulated sourceSScoupling activities. After noting that the FRSA might occupy the field of locomotive warning devices and railroad safety regulation, the court found that it preempted the nuisance claim based on excessive whistling because the trains whistled "in the interest of safety" as they approached a grade crossing and before moving backwards. Finally, the court refused to grant the Rushings' motion to supplement their response with EHS's findings, because they had failed timely to designate their expert and had not moved for leave to designate out of time.[3]

The Rushings moved for reconsideration of the summary judgment, offering deposition testimony from their neighbors that KCS had obtained just days before the ruling. They posited that they had not interviewed the

---

[3] KCS asserts that the court also "held that the switching operations conducted by KCS are in the public interest and, as a result, are privileged from civil prosecution." Although the court noted that KCS had made the argument and referenced it again in its second order, it never addressed the issue's merits.

affiants prior to the depositions but included them in their disclosure simply because they listed everyone who might have knowledge of the situation.

KCS opposed reconsideration, because the motion did not present "newly discovered evidence." The court agreed and also refused to reconsider its exclusion of EHS's testimony, referring again to the failure timely to designate the witness. The court concluded that the motion merely reargued the merits of summary judgment, which is inappropriate for a motion to reconsider.

### III.

We review a summary judgment *de novo*, applying the same standards as the district court. *See Webb v. Cardiothoracic Surgery Assocs., P.A.*, 139 F.3d 532, 536 (5th Cir. 1998); *Figgie Int'l, Inc. v. Bailey*, 23 F.3d 1267, 1269 (5th Cir. 1994). Summary judgment is appropriate if the evidence on record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The admissibility of evidence is subject to the same standards and rules that govern the admissibility of evidence at trial. *See Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 650 n.3 (5th Cir. 1992); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 175-76 (5th Cir. 1990).

The moving party bears the initial burden of demonstrating an absence of evidence supporting the nonmovant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden of establishing the issue at trial is on the nonmovant, the movant accomplishes this merely by pointing out the absence of evidence in the record supporting the issue. *Id*. at 323-24. Although we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial. *See Webb*, 139 F.3d at 536; *Figgie*, 23 F.3d at 1269-70.

KCS does not dispute that the Rushings state a nuisance claim; rather, it asserts affirmative defenses that entitle it to judgment as a matter of law notwithstanding the Rushings' *prima facie* claim. Of course, summary judgment may be granted on this basis. But, because KCS bears the ultimate burden of persuasion on its affirmative defenses, it must adduce evidence to support each element of its defenses and demonstrate the lack of any genuine issue of material fact with regard thereto. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir.), *cert. denied*, 118 S. Ct. 299 (1997).[4]

### IV.

In addition to claiming that a genuine issue of material fact exists regarding the preemption defense as the record stands, the Rushings contest evidentiary rulings that would alter the summary judgment record in their favor. Although we affirm the evidentiary rulings, the Rushings have demonstrated a genuine issue of material fact on the nuisance claim as it relates to noise.

The Rushings also find error in the court's conclusions that the NCA preempts their shock and vibration claim and that no genuine issue of material fact exists regarding the defense that the FRSA preempts their excessive whistle blowing claim. KCS, in addition to disputing the alleged errors, avers that we can affirm summary judgment on the ground that Mississippi tort law does not allow a private nuisance suit against a railroad acting

---

[4] *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (holding that party bearing burden of persuasion must set forth sufficient factual material to support determination that burden of persuasion has been satisfied); *accord Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir.) ("A defendant may use a motion for summary judgment to test an affirmative defense which entitles that party to a judgment as a matter of law. The defendant making such a motion must demonstrate that no disputed material fact exists regarding the affirmative defense asserted."), *cert. denied*, 522 U.S. 914 (1997); *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995).

in a public capacity. We reverse and allow the suit to go forward insofar as the nuisance claim relies on vibrations and excessive whistle blowing. KCS's Mississippi tort law argument erroneously interprets the state's caselaw; we reject it.

### A.

The Rushings contend that the court should have excluded Seidemann's affidavit, alleging that he does not meet the requirements for admissibility of FED. R. CIV. P. 702 expert testimony.[5] Absent the affidavit, KCS lacks summary judgment evidence to establish its affirmative defense of compliance with the NCA regulations. We conclude the court did not err.

### 1.

We reverse the admission of expert testimony only for abuse of discretion. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 274 (5th Cir. 1998) (en banc), *cert. denied*, 119 S. Ct. 1454 (1999). Failure to object to expert testimony forfeits the objection, precluding full review on appeal. *See Marceaux v. Conoco, Inc.*, 124 F.3d 730, 733 (5th Cir. 1997). This rule applies equally to evidence offered to support or oppose summary judgment. *See Donaghey*, 974 F.2d at 650 n.3; *Williamson v. United States Dep't of Agric.*, 815 F.2d 368, 383 (5th Cir. 1987). If the objection is forfeited, we review for plain error.[6]

The proper method of attacking the evidence is by a motion to strike that contains specific objections. *See* 11 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.14[4][a], at 56-197 (3d ed. 1999). The Rushings did not move to strike, but merely raised unsubstantiated fact issues regarding the expert's qualifications.[7] Questioning an expert's qualifications at trial does not preserve the error, even when the party earlier raised an objection in a motion *in limine*; it constitutes an attack on the expert's credibility, not an objection to admissibility under rule 702. *See Marceaux*, 124 F.3d at 734. If questioning an expert's qualifications cannot constitute reiteration of an objection, then, *a fortiori*, it cannot be an objection.[8]

As a result, we review for plain error. We may exercise our discretion to reverse under plain error review only when we find an error that is clear and obvious under current law, that affects the defendant's substantial rights, and that seriously would affect the fairness, integrity or public reputation of judicial proceedings if left uncorrected. *See Marceaux*, 124 F.3d at 734; *United States v. Calverley*, 37 F.3d 160, 162-63 (5th Cir. 1994) (en banc).

### 2.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court instructed district courts to function as gatekeepers, to ensure that only reliable and

---

[5] "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." FED. R. CIV. P. 702.

[6] *See Marceaux*, 124 F.3d at 734; *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1089 (5th Cir. 1988); 11 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.14[4][b], at 56-199 (3d ed. 1999) (explaining that absent motion to strike with specific objection to testimony, court will review only for plain error); FED. R. EVID. 103(d) (stating that failure to object to evidence does not

preclude noticing plain error).

[7] They queried, "Is Dr. Seidemann qualified to make the assertions contained in his affidavit?" "Did Dr. Seidemann's opinion provide the basis for a legitimate assertion that the noise and the other effects the Rushings regularly experienceSSexcessive vibration and shock wavesSSare within the permissible limits of the Noise Control Act or are within its intended scope?"

[8] *Cf. FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986) (refusing to treat "response" as motion to strike where it failed to alert the court to alleged deficiencies in opposition's affidavit).

relevant expert testimony is presented to the jury. *See id*. at 590-93.[9] In determining reliability, courts follow a flexible approach in which they examine factors such as whether the technique can be (and has been) tested, whether it has been subjected to peer review and publication, whether there is a known or potential rate of error, and whether the relevant scientific community generally accepts the technique. *See Daubert*, 509 U.S. at 593-94; *Kumho*, 119 S. Ct. at 1175. Each of these factors may or may not be relevant to the particular inquiry. *See id*.; *Black*, 171 F.3d at 311.

a.

The court did not plainly err in admitting Seidemann's affidavit. The Rushings first attempt to cast doubt on the reliability of the testing method that Seidemann used, pointing out that the court did not make findings such as the acceptance of the technique and its potential rate of error. As KCS responds, however, the affidavit explains that Seidemann precisely followed the techniques that the NCA regulations provide must be used to determine regulatory compliance.

When applicable law mandates the use of a particular test, the proponent of the test's results should not have to establish its reliability. Even if the opponent could prove that it is unreliable, it would be unfair to the proponent to exclude his expert evidence based on the mandated technique. Rather, its reliability irrebuttably should be presumed. Any other rule would place the testimony's proponent in the untenable position of being unable to prove compliance with applicable law because he could not introduce the results of the test mandated by that same law.

It would be fair to challenge Seidemann's compliance with the mandated test; that is, to challenge whether he followed the regulatory technique. If he failed to comply with that technique, Seidemann at the very least would have to establish the reliability of his alternative technique; more likely, the evidence would fail as a matter of law to establish compliance with those regulations. But the record does not reveal that the Rushings have raised a genuine fact issue regarding Seidemann's compliance with the technique.

The primary issue the Rushings raised in the district court and emphasize in their brief is Seidemann's qualifications to conduct outdoor sound measurements under the NCA. They emphasize that Seidemann attested to little experience in conducting outdoor environmental measurements of railroad sounds. We find this argument unpersuasive.

First, the "emphasis on qualifications over reliability of the expert testimony reflect[s] a pre-*Daubert* sensibility." *Watkin v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997). Of course, qualifications remain important; rule 702 requires a qualified expert. A completely unqualified expert using the most reliable of tests should not be allowed to testify. But the heart of *Daubert* is relevance and reliability. As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity.[10]

More importantly, the record reveals that Seidemann is qualified to administer the tests and testify regarding their results. His affidavit explains in detail how he followed the prescribed technique. He is licensed in audiology by Mississippi and several other states. He holds both a Masters and Ph.D. in the field, and has extensive experience both teaching and practicing. He has sat on and

---

[9] Although *Daubert* addressed traditional "scientific" evidence, courts should apply the same rule to all rule 702 experts, including those relying on technical or other specialized knowledge. *See Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1174-75 (1999).

[10] *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

served as chairman of numerous committees related to audiology. He has published extensively, including in forensic and occupational audiology. He has twenty-nine years of experience in conducting sound level measurements in industry and in communities. Finally, his expert testimony has been admitted in numerous other courts. Although he may have limited hands-on experience with the precise measurements he took, the court did not plainly err in accepting his testimony in light of these credentials. *Cf. Lavespere*, 910 F.2d at 176-77 (finding no abuse of discretion on similar facts).

#### b.

The Rushings point out that the initial affidavit filed with the summary judgment motion did not include Seidemann's CV. The only relevant evidence Seidemann sets forth in that initial affidavit is that he is a licensed audiologist and that he conducted his measurements in accordance with the NCA regulations. The Rushings aver that the court should not have considered the supplemental affidavits that were filed without the court's permission to substantiate Seidemann's qualifications only after the Rushings had raised the issue.

The Rushings did not move to strike the supplemental affidavits. This failure differs slightly from the failure to strike the expert affidavit, discussed above, but the difference significantly affects our review. The Rushings' objection to the expert affidavit is an evidentiary objection. As explained above, absent a timely objection or motion to strike, a party forfeits evidentiary objections to summary judgment evidence. We will review, therefore, only for plain error.

Here, however, the Rushings object to the supplemental affidavits on the ground that KCS failed to comply with the procedural rules governing the admission of evidence. Specifically, the argument's merit rests on our interpretation of FED. R. CIV. P. 6 and 56. A failure to make a procedural objection waives

the error, precluding our review.[11] Because the Rushings waived any objection to the affidavits' untimeliness, we may not review the alleged error.

#### B.

The Rushings next argue that the court erred when it denied their motion to supplement their summary judgment response with the affidavit of their own expert from EHS, revealing decibel readings at the Rushings' home well in excess of the regulatory maximums. KCS opposed the motion because the Rushings had not designated the expert within the time established by the court's Case Management Plan Order. The district court denied the motion because the designation of the expert was untimely and was attempted without leave of court to designate out of time.

#### 1.

"The Civil Rules endow the trial judge with formidable case-management authority." *Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir. 1998). Part of the authority includes establishing a case-management schedule that the court enters as an order. *See* FED. R. CIV. P. 16(b); UNIFORM U.S. DIST. CT. RULES D. MISS., Rule 6(d). Expert witnesses must be designated in accordance with that schedule. *See id.* rule 6(g); UNIFORM U.S. DIST. CT.

---

[11] *See Donaghey*, 974 F.2d at 650 n.3 (finding procedural objections to admissibility of summary judgment evidence waived by failure to challenge in district court); *McCloud River R.R. v. Sabine River Forest Prods., Inc.*, 735 F.2d 879, 882 (5th Cir. 1984) (holding that party waived right to raise untimeliness of supplemental affidavit by failing to object or move to strike in district court); *Hicks v. Harris*, 606 F.2d 65, 68 n.3 (5th Cir. 1979) (refusing to review procedural objection to affidavit raised for the first time on appeal, without a motion to strike in the district court); *Auto Drive-Away Co., Inc. v. Interstate Commerce Comm'n*, 360 F.2d 446, 448-49 (5th Cir. 1966) (holding that, absent timely motion to strike, affidavit's non-compliance with procedural rules waived); *see also Calverley*, 37 F.3d at 162 (discussing difference between waiver and forfeiture).

RULES D. MISS. EXPENSE AND DELAY REDUCTION PLAN, § 4(I)(A)(4). A party who fails to comply with the ordered disclosure schedule "shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." *See id*. § 4(I)(A)(5). Indeed, a party who ignores any case-management deadline does so at his own peril. *See* FED. R. CIV. P. 16(f) (authorizing sanctions under FED. CIV. P. 37(b)(2) for noncompliance).[12]

We review a court's case-management decisions, including whether to impose sanctions for violations of a scheduling order and local rules, and the choice of sanction, such as refusing to permit an untimely designated expert witness to testify, for abuse of discretion. *See Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 572 (5th Cir. 1996); *Geiserman,* 893 F.2d at 790. We will not disturb "a trial court's decision to exclude evidence as a means of enforcing a pretrial order . . . absent a clear abuse of discretion." *Id*. In assessing whether a court abused its discretion, we examine four factors: the importance of the witness's testimony; the prejudice to the opposing party of allowing the witness to testify; the possibility of curing such prejudice by granting a continuance; and the explanation, if any, for the party's failure to comply with the discovery order. *See Sierra Club*, 73 F.3d at 572; *Geiserman*, 893 F.2d at 791.

2.

The district court did not abuse its discretion. The importance of the witness to the Rushings' case is undeniable. Although not necessary for their case-in-chief, an expert would prove invaluable in rebutting KCS's attempt to establish its affirmative preemption defense. This importance, however, "cannot

singularly override the enforcement of local rules and scheduling orders." *Id*. at 792.

Furthermore, it would have prejudiced KCS, because it would have needed time to research the witness, review the material and, in response, probably conduct more measurements. Of course, that prejudice could have been ameliorated by a continuance; but delaying rulings or trial never is ideal.[13] More importantly, the court decided to strike the testimony as a sanction for failing to designate the expert; in such a case, prejudice is not a strict requirement, and a continuance would have failed to sanction the Rushings.[14]

---

[12] *See also John v. Louisiana*, 899 F.2d 1441, 1448-49 (5th Cir. 1990) (upholding sanctions under FED. R. CIV. P. 16(f)); *Geiserman v. MacDonald,* 893 F.2d 787, 792 (5th Cir. 1990) (upholding striking of expert pursuant to rule 16(f) for untimely designation).

---

[13] Although we face this issue in a summary judgment posture, designation of an expert is not just for summary judgment purposes; it applies to trial, as well. The potential effects of late designation on trial, therefore, are relevant to our analysis. The Rushings aver that the trial would not have been delayed, but the possibility remains. The summary judgment ruling certainly would have been delayed, and that would have increased the likelihood that the trial, too, would be postponed.

[14] *See Sierra Club*, 73 F.3d at 573 ("While a continuance would have given the [non-offending party] more time to review the late disclosures, such a measure would neither punish [the offender] nor deter similar behavior in the future.") (quotation omitted); *Chilcutt v. United States*, 4 F.3d 1313, 1324 n.30 (5th Cir. 1993) ("While perhaps relevant to the type of sanction imposed, a party need not always be prejudiced by its opponent's discovery abuses prior to the imposition of sanctions. After all, the goal of sanctioning is not to reward the complying party, but to punish the infracting party and to deter others who may be want to engage in similar behavior."); *John*, 899 F.2d at 1448-49 (holding prejudice not strictly required).

Finally, the Rushings do not offer a persuasive justification for failing to designate their expert witness within the ordered time or to move to designate out of time earlier than their attempt to submit the expert affidavit. They argue that they did not need an expert for their case-in-chief; they had no use for one until KCS had relied on its expert report to support summary judgment, and even then did not know the report's importance until KCS tried to make it reliable with the supplemental affidavits. They treated Seidemann as a fact witness until the supplements established his expert qualifications.

Yet, over six months before the Rushings sought to introduce the expert testimony, KCS amended its answer affirmatively to plead the NCA preemption defense. Eight months before the Rushings acted, KCS sought permission to take measurements on their property for the express purpose of supporting the defense; and ten months before the Rushings now claim they knew they needed an expert, KCS initially disclosed Seidemann as an expert who would testify regarding sound levels at the switching yard. At no time did the Rushings designate, or move to designate out of time, their expert.

In light of these early indications that expert testimony would be used in KCS's defense, the Rushings cannot justify waiting until the evidence actually was relied on to designate their own expert, even though they may have had no need to introduce or even gather expert evidence before then. The court acted within its discretion.[15]

C.

The Rushings aver that the district court erred in granting partial summary judgment based on the NCA preemption defense as it relates to noise.[16] The regulations, found at 40 C.F.R. § 201 *et seq.*, set maximum noise emissions for locomotives under both stationary and moving conditions, for rail car operations, and for couplings. Section 201.15 provides for an adjusted, averaged maximum weighted sound level of 92dB at any measurement location on residential or commercial property that receives sounds from the railroad operations. We must determine the preemptive reach of these regulations.

"Where a state [law] conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) (citing U.S. CONST., art. VI, cl. 2). Nonetheless, "a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." *Id.* at 664. The NCA recognizes that it regulates an area of traditional state concern: "primary responsibility for control of noise rests with State and local governments . . . ." 42 U.S.C. § 4901(a)(3). And state common law traditionally governs nuisances. We will find preemption, therefore, only if it is the clear and manifest intent of Congress. *See CSX Transp.*, 507 U.S. at 663; *Davis v. Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc), *petition for cert. filed* (June 15, 1999) (No. 98-2008).

When Congress provides an express preemption provision, we must focus on the plain wording of the clause. *CSX Transp.,* 507 U.S. at 664. NCA's express preemption provision provides,

---

[15] Because the facts would be no different, the court would not abuse its discretion by denying a motion to designate out of time filed on remand. Nonetheless, considering that the preemption defense was not pleaded until after the Rushings' time had expired, and in light of its apparent generosity in considering KCS's late-filed supplemental summary judgment affidavits absent a motion, we hope that in the interest of justice the court, on remand, will look favorably on a motion to designate an expert out of time.

[16] The Rushings also aver that the court erred in refusing to include in the record deposition testimony, taken by KCS just before the court ruled on the summary judgment motion, that they attempted to introduce after the court had ruled via a Motion to Reconsider. We do not reach this issue, because we reverse on other grounds and its resolution will not affect the proceedings on remand.

[A]fter the effective date of a regulation under this section applicable to noise emissions . . ., no State . . . may adopt or enforce any standard applicable to noise emissions resulting from the operation of the same equipment unless such standard is identical to a standard . . . prescribed by any regulation under this section.

42 U.S.C. § 4916(c)(1).

This text is decidedly narrow. The NCA "was not designed to remove all state and local control over noise." *New Hampshire Motor Transp. Ass'n v. Plaistow*, 67 F.3d 326, 332 (1st Cir. 1995).[17] And the clause "in no way suggests that Congress meant for the adoption of any federal noise regulation to bar or displace every state effort to regulate the noise emissions of interstate rail carriers." *Baltimore & Ohio R.R. v. Oberly*, 837 F.2d 108, 114 (3d Cir. 1988).[18] Rather, by its terms, the NCA preempts only those state laws that disparately regulate the same operations that federal regulations govern.[19]

---

[17] The court upheld a town's curfew order enforcing a noise ordinance against a trucking facility, for which regulations setting maximum decibel limits have been promulgated pursuant to the NCA. Although the town could not mandate different decibel levels for motor carriers, neither the curfew nor the ordinance purported to regulate decibel levels. *See New Hampshire Motor Transp.*, 67 F.3d at 332. "Rather, noise levels were one element of an equation that also included 'odors, dust, smoke, refuse matter, fumes . . . and vibration' and that prompted a limitation on operating hours for one specific site." *Id.* The court found this acceptable, holding "it would stretch the [preemption clause's] words beyond their ordinary meaning to strike down a curfew order based on a range of concerns where federal law regulates only the decibel levels of the equipment." *Id.*

[18] The court upheld a state noise control statute governing an intermodal shipping facility against a facial preemption challenge. *See Baltimore & Ohio R.R.*, 837 F.2d at 116. Absent some actual conflict between the state statute and the federal regulations, the court held that the state could apply its ordinance to the facility. *See id.* at 109, 116.

[19] Any claim that the NCA occupies the field of noise regulation is unfounded. *See id.* at 113-14 (holding § 4916(c)(1) "is not a global preemption provision"). Nor does 42 U.S.C. § 4911 (providing a federal right of action for injunctive relief to force compliance with the NCA) evince an intent to completely preempt state law. The same section provides that it does not "restrict any right . . . under any statute or common law to seek enforcement of any noise control requirement or to seek any other relief." 42 U.S.C. § 4911(e).

A state may employ or allow a common law action for damages, then, only to enforce federal regulations or to regulate aspects of railroads and switching over which the state has discretionary authority.[20] This outlines the parameters of KCS's affirmative preemption defense. If KCS establishes that it complies with the NCA's noise regulations, then the NCA preempts the nuisance suit insofar as that suit complains of excessive noise. If KCS fails to establish its regulatory compliance, then the suit may proceed to enforce compliance by the award of damages for excessive, nuisance-causing noise. Similarly, if KCS fails to establish that the NCA regulates the operation of the equipment at issue, then no preemption of state law exists. The district court, therefore, correctly concluded that Mississippi cannot enforce noise limits stricter than those set forth in § 201.15, covering the operations at KCS's switchyard.[21]

### 1.

With the scope of KCS's affirmative defense established, we turn to the Rushings' argument that the court erred by granting summary judgment for KCS insofar as they complain about noise at the switchyard. The question is whether a genuine, material fact issue exists regarding KCS's compliance.

Seidemann attested that his measurements demonstrate that KCS operates the switchyard in accordance with the regulations. In their affidavits, however, the Rushings dispute that Seidemann's measurements reflect the noise they typically hear. They claim that the court should have admitted this testimony pursuant to FED. R. EVID. 701, governing lay opinions, and that it raises the factual question whether KCS has established its compliance.[22]

### a.

wary of this approach, but need not address it, because the Rushings have not urged, either on appeal or in the district court, that their nuisance suit could function as a similar temporal restriction.

[22] Rule 701, FED. R. CIV. P., provides that a non-expert "witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue" similar temporal restriction.

We review a rejection of rule 701 testimony for abuse of discretion. *See Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 459 (5th Cir. 1997); *Miller v. Universal Studios, Inc.*, 650 F.2d 1365, 1374 (5th Cir. July 1981). Under rule 701, "a lay opinion must be based on personal perception, must 'be one that a normal person would form from those perceptions,' and must be helpful to the jury." *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997) (quoting *Soden v. Freightliner Corp.*, 714 F.2d 498, 511 (5th Cir. 1983)); *see also Robinson v. Bump*, 894 F.2d 758, 763 (5th Cir. 1990).

We do not know whether the district court excluded the testimony or, instead, decided that it did not raise a genuine issue of material fact. The court's opinion does not mention the Rushings' affidavits, but merely states that KCS established compliance with the guidelines.

If the court did exclude the testimony, then it abused its discretion. Indeed, KCS does not dispute this. The Rushings perceived that the sounds on the night KCS's expert measured them were of a lesser volume than on a typical night. There is no way to state this fact except by the conclusory inference that they were quieter, and that fact would be helpful to the jury in assessing KCS's compliance with the regulations.[23]

b.

The real dispute is whether this testimony raises a genuine fact issue. We conclude that it does. KCS bears the burden of adducing evidence to establish its compliance, which the Seidemann affidavit accomplishes. The Rushings came forward with specific facts contradicting KCS's evidence, disputing that the measurements are representative of the noise they typically must endure. This creates a factual issue for the jury, precluding summary judgment.

KCS attacks the evidence in essentially three ways. First, it argues that the Rushings' assertions are legally insufficient to contradict the expert testimony that the measurements were taken in compliance with the NCA regulations, and that they demonstrate compliance with the maximum decibel levels. This argument misses the point.

The Rushings do not claim (at least on this point) that the measurements failed to meet NCA specifications, or that they did not demonstrate compliance on one night. They contend, instead, that the measurements are not representative and hence cannot establish compliance on a typical evening. It would defeat the purpose of regulating maximum noise levels if a railroad could demonstrate compliance on one evening but exceed the limits with impunity every other night.

The representativeness of the measurements, then, is material to compliance. Although, as KCS emphasizes, the measurements may have captured the right amount of activity (at least 30 couplings per 60-to-240-minute session), they did not necessarily record the volume regularly associated with the switching yard. If the trier of fact believed that on the night in question the operators slowed the speed at which they coupled and coupled fewer cars at a time, then it could reject KCS's evidence as atypical.

Second, in a related argument, KCS avers that lay people are not competent to give NCA compliance opinions; rather, expert testimony is required, and the Rushings have timely proffered none. Even if true, this is a *non sequitur*. The Rushings do not testify regarding NCA compliance; they simply testify that the measurements are not representative, because the noise was quieter than usual on the evening they were taken. As explained

---

[23] *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995) ("The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of person, degrees of light, or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.").

above, the Rushings are competent to make that assessment under rule 701.

Finally, KCS argues that the evidence is insufficient to create a genuine fact issue because it is too vague and self-serving. KCS is right that the Rushings must come forward with "significant probative evidence." *See State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990) (quoting *In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982)). Although their burden is not as high as it is on the typical nonmoving plaintiff, because KCS bears the burden of proof on its affirmative defense, a scintilla of evidence is not enough; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252). Nor are conclusional allegations sufficient.[24]

But merely claiming that the evidence is self-serving does not mean we cannot consider it or that it is insufficient. Much evidence is self-serving and, to an extent, conclusional. "At the margins there is some room for debate as to how 'specific' must be the 'specific facts' that Rule 56(e) requires in a particular case." *Id.* at 889.

If the Rushings merely asserted that "the testing is bad," or "the noise usually is louder," then we probably would have to reject it as insufficient to create a genuine fact issue. They offered more: They both attested that the night in question was atypicalSSan assessment they are qualified to make. Both gave numeric comparisons on a one to ten scale of that night to a typical night.

The Rushings even proffered potential explanations, based on their personal observations, for why it was quieter than usual. Willard Rushing explained that "it

seemed the engineers did not start the cars running down hill with the same speed they normally do and, therefore, the noise that resulted from the impact of the coupling and uncoupling operations, was significantly lower than the noise that we usually hear. In fact, the uncoupling during the measurements was one car at a time when usually the uncoupling involves numerous cars at the same time."

Similarly, Patricia Rushing observed that "the engineers did not switch cars in multiples as they normally do but switched only one car at a time. They did not get a running start and then cut several cars loose at once as they often do. Thus, the noise level created by coupling was not representative of the noise level we normally experience from the coupling activities." As KCS acknowledged at argument, "[c]ommon sense would tell you that if you're going faster, you're going to have a louder noise."

---

[24] *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [requiring the nonmovant to set forth specific facts] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

Willard Rushing testified that even "Dr. Seidemann recognized that the operations had been changed or were different from what he expected because he told my wife and me that he had to go to the railroad yard to see what was going on." These provide sufficient specific facts raising a genuine issue for trial on the affirmative defense of preemption. Accordingly, KCS was not entitled to summary judgment on the nuisance claim based on noise emissions.

2.

The Rushings also contest the district court's conclusion that the NCA preempts their nuisance claim insofar as it complains of vibrations and shocks from the switchyard activity. The only regulations applicable are those limiting decibel levels of noise emissions from certain train operations. Conspicuously absent is a clear and manifest purpose to preempt state action beyond the regulation of noise emissions from the specified operations. Neither the statute nor the regulations mention vibrations. In fact, KCS does not contend that the NCA regulates vibrations or shocks *per se*.[25]

The district court made the perfunctory conclusion that, "[s]ince there is a direct correlation between the level of vibrations and the level of noise, the Court finds that the two are one in the same and therefore Plaintiff's nuisance claim based upon excessive vibrations will be dismissed." If this were true, we should find the shocks and vibrations aspect of the claim preempted as well, for a plaintiff should not be able to restrict vibrations as a

backdoor way of circumventing the noise regulations' preemptive effect.

The summary judgment record, however, is devoid of evidence supporting the court's conclusion. Seidemann did not attest to the fact, nor does other evidence indicate that noise and vibrations are one and the same. Because KCS seeks summary judgment on its affirmative defense, it shoulders the burden of demonstrating the lack of a genuine issue of material fact regarding it. It has not.

Nor can we accept the court's *ipse dixit* that they are one and the same, as though it were a matter of which we can take judicial notice. Sound is a complex phenomenon, making it impossible to conclude, without evidence, that the relevant vibrations and decibels are directly and causally correlated.

In addition, the Rushings claim damages from the vibrations and shocks that shake their property. Although some of the vibrations and shocks may be caused by sound waves, no evidence substantiates that any of them is. Perhaps large rail cars crashing together cause shock waves distinct from sound waves that cause the Rushings' home to shake and wall decorations to slip.[26]

---

[25] KCS does point out that the noise and vibrations stem from the same subject matter of coupling activities, citing *CSX Transp.*, 507 U.S. at 664-65, for the proposition that the subject matter regulated determines preemptive scope. But viewing the preempted subject matter narrowly, as we must, the subject matter is *noise* from coupling and not just coupling. To establish preemption of the vibrations aspect of the complaint, KCS must show that decibels and vibrations are causally and directly correlated, such that the regulation of vibrations directly would affect decibels and enable backdoor regulation of noise.

[26] The common observations that the Rushings make convince us that evidence is required before we could accept the court's conclusion. A large bass speaker in a car might cause excessive vibrations in a neighboring car without "sounding loud." An air horn and the clash of two train cars coming together might be equally "loud" at the source, but the air horn will not shake one's windows, while the clashing cars might. Dropping an empty metal drum onto a metal surface would create a loud clanging noise and vibrationsSSnot unlike the clash of cymbals. The same drum filled with sand and dropped from the same height onto the same surface would sound less loud (more of a dull thud) but would create significantly larger shock waves.

KCS may be able to establish preemption with proper evidence explaining why the pertinent vibrations and decibels are directly correlated. But in the absence of summary judgment evidence, the court should not have dismissed this aspect of the claim.[27]

### D.

The Rushings find error in the dismissal of their nuisance claim as preempted by the FRSA insofar as it complains of excessive train whistling, contending that a genuine issue of material fact exists as to whether KCS sounds its whistles only for necessary safety reasons. We agree.

### 1.

Recognizing that the NCA regulations explicitly exclude train whistles from their scope, *see* 40 C.F.R. § 210.10, the district court held that the FRSA preempted the Rushings' excessive whistling complaint. The FRSA was enacted "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons . . . ." *CSX Transp.*, 507 U.S. at 661 (quoting 45 U.S.C. § 421). The Act grants the Secretary of Transportation broad power to promulgate regulations "for all areas of railroad safety." *Id.* at 662 (quoting 45 U.S.C. § 431(a)). Congress expressly defined the preemptive scope of any promulgated regulations:

> States may "adopt or continue in force any law, rule, regulation, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation or order, or standard covering the same subject matter of such State requirement." Even after federal standards have been promulgated, the States may adopt more stringent safety requirements "when necessary to eliminate or reduce an essentially local safety hazard," if those standards are not "incompatible with" federal laws or

regulations and not an undue burden on interstate commerce.

*Id.* (quoting 45 U.S.C. § 434).

"FRSA preemption is even more disfavored than preemption generally." *Southern Pac.*, 9 F.3d at 813. The restrictive terms of its preemption provision "indicate[] that preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *CSX Transp.*, 507 U.S. at 664. When applying FRSA preemption, the Court has eschewed broad categories such as "railroad safety" and has looked at the narrow categories of "warning devices" installed at federally-improved grade crossings and "train speed." *Id.* at 665-75; *see also Southern Pac.*, 9 F.3d at 813.[28]

Regulations promulgated pursuant to the FRSA require all lead locomotives to be equipped with audible warning devices with a specified minimum decibel level. *See* 49 C.F.R. § 229.129. From this regulation and the fact that KCS allegedly sounds its whistles only as required for safety reasons (at grade crossings and before backing up), KCS contends that the nuisance claim is preempted. Given the narrow scope of FRSA preemption, however, the cited regulations do not preempt the claim. In fact, the nuisance claim does not constitute a state railroad safety regulation at all.

Specifically, the Rushings complain about when the trains sound their whistles (at night, for no apparent reason); the regulations address only the sound-producing capacity of

---

[27] *Cf. British Airways Bd. v. Port Auth.*, 564 F.2d 1001, 1010-12 (2d Cir. 1977) (treating noise and vibrations as distinct).

[28] KCS's claim that the FRSA and its regulations "occupy the field of locomotive warning devices and train safety" is utterly at odds with the Court's holding that the FRSA does not preempt a wrongful death action based on an accident at a grade crossing, despite the regulations' coverage of warning devices at federally-funded grade crossings. *See CSX Transp.*, 507 U.S. at 671-72. The only case it cites, unpersuasive authority on its own, pre-dates *CSX Transp.*

the whistles.[29]   A sound capacity safety regulation does not substantially subsume regulations on when whistles are sounded.  *See Southern Pac.*, 9 F.3d at 813.  Although the state likely could not regulate the sounding of whistles by banning them altogether, because it would defeat the purpose of the whistle capacity provision, it can impose restrictions on when they are sounded. *See id.*  The FRSA does not preempt the nuisance claim as a matter of law.

2.

In a similar vein, KCS argues that the claim is preempted because non-FRSA law requires it to sound whistles when it does.  We do not consider KCS's reliance on state law requiring a train to sound its whistle before a grade crossing, because KCS did not raise the state statute in the district court and hence may not raise it now.  Nor may we rely on KCS's operating rules that require sounding a warning before reversing or crossing a grade.  Although KCS files these rules with the Federal Railroad Administration, that agency neither approves nor adopts them; they do not have the force of law and hence cannot preempt state law.  *See id.* at 812 n.5.

A nuisance action embodies considerations of reasonableness.[30]  Nuisance liability should

be limited by KCS's necessary and reasonable sounding of whistles for safety reasons; state law and KCS's operating requirements may be relevant to establishing the reasonableness of whistle soundings.  If KCS demonstrated that it sounds its whistles only in the interest of safety, we might be persuaded that summary judgment is appropriate.

The Rushings, however, have demonstrated a genuine issue of fact as to whether the trains sound whistles only in the interest of safety.  KCS introduced an affidavit that attested that its trains sound whistles only before grade crossings and before reversing.   Willard Rushing, on the other hand, avers that the trains sound whistles "for long periods of time when the trains are not moving or beginning to move."[31]

KCS challenges Rushing's testimony as "conclusionary" and not based on "having observed the locomotives," arguing that we should not rely on this "mere unsupported conjecture."  Yet Rushing specifically testified that the whistles sound when the trains are not moving, and with no reference to a crossing or to reversing.  These observations necessarily imply that he personally has observed the trains not moving while hearing whistles.  This presents competent summary judgment evidence.

The district court held that "[t]he whistles on the trains . . . are sounded as the trains approach a grade crossing and before the trains move backward."   In reaching this conclusion, it resolved conflicting testimony in KCS's favor.  It cannot do this on a summary

---

[29] S*ee Southern Pac.*, 9 F.3d at 813 (upholding state regulations that restrict the sounding of train whistles only at grade crossings with certain safety devices and only between certain hours).

[30] *See T.K. Stanley, Inc. v. Cason*, 614 So. 2d 942, 953 (Miss. 1992) ("One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.") (quoting RESTATEMENT (SECOND) OF TORTS § 882)).  Sounding whistles constitute an intentional invasion; "[a]n intentional invasion of another's interest in the use and enjoyment of land is unreasonable if . . . the gravity of the harm outweighs the utility of the actor's

conduct."   RESTATEMENT (SECOND) OF TORTS § 826.

[31] He further attests that they "are not signaling to move since the trains do not in fact move after whistling but often sit there for long periods simply tooting on the whistlesSSback and forth." "Whistles are often sounded at times that have no reference to a crossing or to backing up.  The whistles regularly occur when the engines are neither moving nor beginning to move."

judgment motion, however. *See Anderson*, 477 U.S. at 249 (observing that "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The Rushings have demonstrated a genuine issue of material fact on the FRSA preemption defense, and KCS has not established it is entitled to judgment as a matter of law.

E.

KCS also argues that it carries out its functions in the public interest and that, under Mississippi law, a private nuisance suit will not lie against a railroad for its public acts, absent a showing of negligence. Contrary to KCS's suggestion, the district court did not decide this matter in its order. Nonetheless, we may affirm summary judgment on any basis evident in the record. *See Chriceol v. Phillips*, 169 F.3d 313, 315 (5th Cir. 1999); *Davis v. Liberty Mut. Ins. Co.*, 525 F.2d 1204, 1207 (5th Cir. 1976).

KCS correctly posits that absent a showing of negligence, Mississippi tort law exempts the public functions of a railroad from private nuisance suits absent a showing of negligence. *See Jenner v. Collins*, 52 So. 2d 638, 640 (Miss. 1951); *Robertson v. New Orleans & G.N.R.R.*, 129 So. 100, 102 (Miss. 1930); *Dean v. Southern Ry.*, 73 So. 55, 56-57 (Miss. 1916). An action taken "to serve the public generally . . . must be characterized as a public and not a private act of the railway company." *Dean*, 73 So. at 56. This distinction between public and private acts is crucial, because only the public acts of a railroad are *damnum absque injuria*. KCS contends that its switchyard activities are public acts, because the operations are essential for transporting goods over its lines to the public's benefit.

KCS's argument lacks merit. KCS quotes a long passage from *Dean* that holds a party cannot recover for "any injury which is the result of noise produced by the operation of trains on main lines." *Id*. This principle extends to spur tracks that connect to main lines. *See id*. But the next paragraph after the one KCS quotes distinguishes that case from a railroad's private functions:

> It may be conceded that a railroad company is not protected by its charter in creating a private nuisance. It cannot locate its machine shops, roundhouses, coal chutes, water tanks, or private switchyards near or adjacent to private property under such circumstances as to create a private nuisance and thereby depreciate or damage private property. In the placing or construction of these conveniences the railroad company has the power of selection; its act in placing or installing these necessary conveniences must be classed as the private acts of a public corporation.

*Id*. at 56-57.

KCS also quotes a passage from *Robertson* that ends with the following:

> As to all those functions which are exercised in the direct or immediate service of the public in the carrying passengers and in the transportation and handling of freight, these are public, and, so long as exercised without negligence and in the customary manner with appropriate instrumentalities, are within the protection of the public franchise . . . .

*Robertson*, 129 So. at 102. Yet the very next sentence states,

> But to all those permanent features of the service which appertain merely to the means of the supply of those instrumentalities, and in keeping them in order and making them available for said direct service, they belong to the private part, and, although incidental, are not things with which the public is directly concerned; they are things which the railroad manages for its own interest . . . .

*Id*.

18

The opinion goes on to quote the above passage from *Dean* to distinguish traffic on mainlines, spur tracks, and intersection switches from the private acts for which a railroad may be liable, including the placement of a switchyard near private property so as to create a nuisance. *Id*. Indeed, *Robertson*'s ultimate holding allows a nuisance action complaining of noise and vibrations from a railroad's switchyard that had been constructed next to the plaintiff's home to proceed. *See id*. at 101-02.

The Rushings complain about the noise and vibrations coming from KCS's private switchyard, constructed right next to their homeSSthe very situation presented in *Robertson*. *Robertson*'s holding is squarely on point. KCS can be held liable under Mississippi law for bringing this nuisance to the Rushings.

For the foregoing reasons, the judgment is REVERSED and REMANDED for further proceedings.

KING, Chief Judge, concurring in part and dissenting in part:

While I concur in much of the majority opinion, I disagree on some crucial points. First, I cannot conclude that the Rushings' testimony that the noises emanating from KCS's railyard on the night that Seidemann took his measurements were substantially quieter than the sounds they typically endure raises a genuine issue of fact as to KCS's compliance with the federal regulations. The Noise Control Act of 1972 provides:

> [A]fter the effective date of a regulation under this section applicable to noise emissions resulting from the operation of any equipment or facility of a surface carrier engaged in interstate commerce by railroad, no State or political subdivision thereof may adopt or enforce any standard applicable to noise emissions resulting from the operation of the same equipment or facility of such carrier unless such standard is identical to a standard applicable to noise emissions resulting from such operation prescribed by any regulation under this section.

42 U.S.C. § 4916(c)(1). The federal regulations promulgated under this statute set out permissible sound emission levels as measured from properties affected by noise from railyard operations. See 40 C.F.R. § 201.11 (standard for locomotive operation under stationary conditions); id. § 201.12 (standard for locomotive operation under moving conditions); id. § 201.13 (standard for rail car operations); id. § 201.14 (standard for retarders); id. § 201.15 (standard for car coupling operations); id. § 201.16 (standard for locomotive load cell test stands). The regulations also specify measurement criteria that "contain the necessary parameters and procedures for the measurement of

**20**

the noise emission levels prescribed . . . ." Id. § 201.20; see id. §§ 201.21-.27. Thus, sound emission levels within the limits set out in the regulations, as measured in accordance with the procedures prescribed thereby, comply with federal law. Under the Noise Control Act, a state may not adopt or enforce a different standard for noise emissions. See 42 U.S.C. § 4916(c)(1).

In this case, it is undisputed that Seidemann complied with the federal regulations in taking his measurements and that the measurements showed sound levels well within the limits prescribed by the regulations. While the Rushings insist that the noises emanating from the switchyard during the night that Seidemann took his measurements were not representative of the conditions in which they usually live, the regulations do not require that the sound emission measured be "typical," whatever that may mean. They do specify certain instruments, locations, lengths of time, and weather conditions for measurement. I cannot imagine that compliance with the Noise Control Act and its regulations requires that a railroad go beyond the dictates of those documents to ensure that measurements are "representative" or "typical." Such a rule would run directly counter to the Act's prohibition on any standards for railroad noise emissions that are not identical to those in the regulations. Indeed, the majority's reasoning guts the preemptive effect of the federal regulations: No matter what sound emission measurements show, a plaintiff will be able to obtain a trial on her nuisance claim

21

simply by claiming that the noises measured were not typical. Therefore, I do not believe that the Rushings' testimony suffices to raise a genuine issue of fact as to KCS's compliance with the Act and the regulations. I would hold that, insofar as it is based on noise, the Rushings' nuisance claim is preempted.

Subject to the discussion below, I agree with the majority that federal law does not preempt the Rushings' nuisance suit insofar as it is based on vibrations, shocks, and excessive train whistling. In my view, however, the viability of these claims depends on whether the railyard's activities are public acts exempted from private nuisance suits. I cannot join the majority's characterization of KCS's argument in this regard as lacking in merit. Two decisions of the Mississippi Supreme Court, Robertson and Dean, are central. In Robertson v. New Orleans & G.N.R. Co., 129 So. 100 (Miss. 1930), the plaintiff filed a nuisance suit alleging that the defendant railroad had "erected and constructed and is now maintaining certain railroad tracks, including six private switch tracks, each about one mile in length, yards, railroad work shops, wye, terminals, a place for refueling, firing and watering, and a place for the switching, storing and cleaning of engines, coaches and cars" that produced excessive noise, vibrations, and filth. Id. at 101. The lower court dismissed the suit. See id. at 102. The Mississippi Supreme Court ruled:

> A railroad serves both the public and itself. As to all those functions which are exercised in the direct or immediate service of the public in the carrying of passengers and in the transportation and handling of

22

> freight, these are public, and, so long as exercised without negligence and in the customary manner with appropriate instrumentalities, are within the protection of the public franchise granted to that end. But all those permanent features of the service which appertain merely to the means of the supply of those instrumentalities, and in keeping them in order and making them available for said direct service, they belong to the private part, and, although incidental, are not things with which the public is directly concerned; they are things which the railroad manages for its own interest. . . .
>
> The result is that for the normal operations, however heavy this may be between station and station, or from station to a local shipping or loading point, or point of unloading, and whatever the number of tracks or trains, including all station or interstation switching, there is no liability for consequential damages. But, to quote the language of the Dean Case [Dean v. Southern Ry. Co., 73 So. 55 (Miss. 1916)], the railroad "cannot locate its machine shops, roundhouses, coal chutes, water tanks, or private switchyards" and those other permanent things which belong to its private concerns "near or adjacent to private property under such circumstances as to create a private nuisance and thereby depreciate or damage private property." The pleadings make in part, therefore, a case which falls within this rule, and the cause should not have been wholly dismissed.

Id. at 102. Contrary to the majority's assertion, Robertson neither holds that a railroad may be liable for "the placement of a switchyard near private property so as to create a nuisance" nor "allows a nuisance action complaining of noise and vibrations from a railroad's switchyard that had been constructed next to the plaintiff's home to proceed." Rather, Robertson permits nuisance suits against private switchyards. Moreover, while the Robertson court held that not all of the plaintiffs' case should have been dismissed, it clearly viewed the lower court's dismissal as partially correct, and it did not specify which railroad facilities among the many the plaintiffs named could give rise to nuisance liability.

23

Like Robertson, Dean provides some guidance as to the public function-private function distinction but does not ultimately control the case at bar.  In Dean, the plaintiff filed a nuisance suit alleging excessive noise from a spur track near his home that ran from the railroad's main line to a cotton compress.  See Dean, 73 So. at 56.  The Mississippi Supreme Court noted that

> [p]laintiff does not complain of private switchyards installed by the railroad company.  The spur track here complained of is a service track, made necessary for the depositing and taking aboard of large quantities of cotton handled by a large compress--the legitimate railroad business required by a legitimate compress business.  There is no contention by appellant that this service track is unnecessary, or that there is any negligence by the railroad company, either in the selection of its engines and cars or in the way they are handled and switched at this point.  The compress company had the right to call for the installation of this service track, and, if the railroad company should decline to install or furnish it, it could be compelled to do so by the Railroad Commission.  The business done over this spur track therefore is the same character of business done at the regular freight depots.  The spur track was installed to serve the public generally, and the act of installation must be characterized as a public and not a private act of the railway company.  The noise produced by the defendant's trains over and upon this spur track falls in the same class as the noise produced by the operation of trains over the main line of railway.

Id. at 56.  Later, the court distinguished "machine shops, roundhouses, coal chutes, water tanks, or private switchyards," whose activities can give rise to nuisance liability, on the grounds that "[i]n the placing or construction of these conveniences the railroad company has the power of selection . . . . But in the installation of a spur track like the one here complained of the railroad company has no option.  It must afford the service, and in doing so it is serving the public generally."  Id. at 56-57.

24

KCS argues that under the principles enunciated in Dean and Robertson, the switchyard at issue in this case cannot give rise to nuisance liability. KCS contends that its railyard, like Dean's spur track, is a public necessity, not a convenience: "[T]he rail yard, which includes the KCS main line, is a hub of interstate commerce used to sequence and build up trains to be sent to different destinations. The beneficiaries are the public in general that transport loads over KCS's interstate line, a function that would not be possible without the yard." In support of this assertion, KCS cites the affidavit of Andy Martin, the railyard's trainmaster, who averred that the yard "consists of several switching tracks, which run off of the main line" and "is in essence an interstation switching point, or hub, wherein trains drop off and pickup railcars and deliver them to various locations in the country." In my view, KCS's argument that the railyard performs public functions is not frivolous. The district court did not address its merits,[32] however, and

---

[32] In its August 26, 1998 Opinion and Order on the Rushings' Second Motion to Supplement Response to Motion for Summary Judgment and Motion to Reconsider and Reverse the Court's Opinion and Order Filed July 29, 1998, the district court said: "In granting Defendant's Motion for Summary Judgment on July 29, this court found that (1) Plaintiffs' allegations are preempted by the Noise Control Act of 1972, 42 U.S.C. § 4916 and (2) the switching activities at the rail yard are in the public interest and cannot be the subject of a claim for private nuisance." The July 29, 1998 Opinion and Order does not, however, so find; it merely recognizes that KCS claimed that it was entitled to summary judgment because "the switching activities conducted at the rail yard are in the public interest and cannot be the subject of a claim for private nuisance." Like the majority, I read the district court's August 1998 statement as a mischaracterization of its earlier opinion and conclude that it did not, in fact, address the merits of KCS's argument that its switching activities are public functions.

25

because I think that the district court is better suited than the court of appeals to make a first determination of whether the activities taking place at the yard in question were public functions, I would remand for such findings.

Accordingly, I would AFFIRM the district court's holding that federal law preempts the Rushings' nuisance claim insofar as it complains of excessive noise other than train whistling, and I respectfully dissent from the majority's decision to reverse on this portion of the Rushings' claim. I would REVERSE AND REMAND the district court's ruling on the vibration and train whistling issues with instructions to (1) decide whether the railyard's activities are public acts exempt from private nuisance suits under Mississippi law; (2) dismiss the lawsuit if it finds that the railyard's activities are, in fact, public acts; and (3) address the vibration and train whistling claims in light of our unanimous conclusion that these are not preempted by federal law if it finds that the railyard's activities are private acts.[33] Accordingly, while I concur in the majority's decision to reverse and remand on these issues, I differ strongly with the majority's rationale for so doing.

---

[33] I have no quarrel with the majority's evidentiary and procedural holdings.