1
 2025 CO 21 In Re County Commissioners of Boulder County and City of Boulder, Plaintiffs: v. Suncor Energy USA, Inc.; Suncor Energy Sales, Inc.; Suncor Energy Inc.; and Exxon Mobil Corporation, Defendants: No. 24SA206
Supreme Court of Colorado, En Banc
May 12, 2025
 
          
 Original Proceeding Pursuant to C.A.R. 21 Boulder County
 District Court Case No. 18CV30349 Honorable Robert R.
 Gunning, Judge
 
 
          Order
 Discharged
 
 
          
 Attorneys for Plaintiffs: Singleton Schreiber, LLP Kevin S.
 Hannon Yohania T. Santana Denver, Colorado
 
 
           Law
 Office of Marco B. Simons Marco Simons Washington, District
 of Columbia
 
 
          
 Richard Herz Michelle C. Harrison Washington, District of
 Columbia
 
 2
 
          
 Attorneys for Defendant Exxon Mobil Corporation: Faegre
 Drinker Biddle & Reath LLP Colin G. Harris Matthew D.
 Clark Boulder, Colorado
 
 
           Paul,
 Weiss, Rifkind, Wharton & Garrison LLP Theodore V. Wells,
 Jr. Daniel J. Toal Yahonnes Cleary Caitlin E. Grusauskas New
 York, New York
 
 
           Paul,
 Weiss, Rifkind, Wharton & Garrison LLP Kannon K.
 Shanmugam, Washington, District of Columbia
 
 
          
 Attorneys for Defendants Suncor Energy USA Inc.; Suncor
 Energy Sales, Inc.; and Suncor Energy Inc.: Wheeler Trigg
 O'Donnell LLP Hugh Q. Gottschalk Eric L. Robertson
 Denver, Colorado
 
 
          
 Attorneys for Respondent Boulder County District Court:
 Philip J. Weiser, Attorney General Janna K. Fischer,
 Assistant Solicitor General Christopher J.L. Diedrich,
 Assistant Solicitor General Jaclyn M. Calicchio, Senior
 Assistant Attorney General Denver, Colorado
 
 
          
 Attorneys for Amici Curiae American Association for Justice
 and Colorado Trial Lawyers Association: 5280 Appellate Group,
 a division of the Paul Wilkinson Law Firm LLC Nelson Boyle
 Denver, Colorado
 
 3
 
          
 Attorneys for Amicus Curiae Chamber of Commerce of the United
 States of America: Crisham & Holman LLC John K. Crisham
 Littleton, Colorado
 
 
          
 Attorney for Amici Curiae Environmental Law & Justice
 Scholars & Advocates: Asha J. Brundage-Moore Denver,
 Colorado
 
 
          
 Attorneys for Amicus Curiae National Association of
 Manufacturers: Shook, Hardy & Bacon LLP Daniel E. Rohner
 Denver, Colorado
 
 
          
 Attorneys for Amicus Curiae Natural Resources Defense
 Council: Kaplan Kirsch LLP Samantha R. Caravello Denver,
 Colorado
 
 
          
 Attorneys for Amici Curiae Professor Richard Epstein,
 Professor John Yoo, and Mountain States Legal Foundation:
 William E. Trachman Ivan L. London Lakewood, Colorado
 
 
          
 Attorneys for Amici Curiae Robert Brulle, Center for Climate
 Integrity, Justin Farrell, Benjamin Franta, Stephan
 Lewandowsky, Naomi Oreskes, Geoffrey Supran, and Union of
 Concerned Scientists: Keller Rohrback L.L.P. Katherine J.
 Klein Denver, Colorado
 
 
          
 Justice Gabriel delivered the Opinion of the Court, in which
 Chief Justice Márquez, Justice Hood, Justice Hart, and
 Justice Berken Kotter joined. Justice Samour, joined by
 Justice Boatright, dissented.
 
 4
 
          
 OPINION
 
 
          
 GABRIEL, JUSTICE
 
 
          ¶1
 Although this case presents substantial issues of global
 import, the question before us is narrow: whether the
 district court erred in concluding that the common law tort
 claims brought by plaintiffs, the County Commissioners of
 Boulder County and the City of Boulder (collectively,
 "Boulder"), against defendants, Exxon Mobil
 Corporation, Suncor Energy USA, Inc., Suncor Energy Sales,
 Inc., and Suncor Energy Inc., may proceed under state law.
 Specifically, Boulder asserts claims for public and private
 nuisance, trespass, unjust enrichment, and civil conspiracy,
 and it seeks damages for the role that defendants'
 production, promotion, refining, marketing, and sale of
 fossil fuels has allegedly played in exacerbating climate
 change, which, in turn, has purportedly caused harm to
 Boulder's property and residents. Defendants contend that
 these claims are preempted by federal law.
 
 
          ¶2
 We now conclude that Boulder's claims are not preempted
 by federal law and, therefore, the district court did not err
 in declining to dismiss those claims. Accordingly, we
 discharge the order to show cause and remand this case to the
 district court for further proceedings consistent with this
 opinion. In doing so, we express no opinion on the ultimate
 viability of the merits of Boulder's claims.
 
 5
 
          I.
 Facts and Procedural History
 
 
          ¶3
 Boulder brought the present action against defendants seeking
 damages for "the substantial role that their production,
 promotion, refining, marketing and sale of fossil fuels
 played and continues to play in causing, contributing to and
 exacerbating alteration of the climate, thus damaging
 Plaintiffs' property, and the health, safety and welfare
 of their residents." Specifically, in its amended
 complaint, Boulder alleges that it has incurred and will
 continue to incur millions of dollars in costs to protect its
 property and residents from the impacts of climate change.
 Boulder contends that these costs should be shared by
 defendants "because they knowingly caused and
 contributed to the alteration of the climate by producing,
 promoting, refining, marketing and selling fossil fuels at
 levels that have caused and continue to cause climate change,
 while concealing and/or misrepresenting the dangers
 associated with fossil fuels' intended use." Boulder
 further alleges that defendants have engaged and continue to
 engage in these activities despite knowing that the burning
 of their fossil fuels would exacerbate climate change and its
 impacts. And Boulder alleges that, through their advertising,
 defendants have for decades intentionally misled the public
 about the impacts of climate change and the role that
 defendants' fossil fuel products have played in
 exacerbating those impacts.
 
 6
 
          ¶4
 Based on these factual allegations, Boulder asserts, as
 pertinent here, causes of action for public nuisance, private
 nuisance, trespass, unjust enrichment, and civil conspiracy.
 Because the precise nature of Boulder's allegations is
 important to our analysis, we discuss those allegations in
 some detail.
 
 
          ¶5
 In its public nuisance claim, Boulder alleges that
 defendants' fossil fuel activities have contributed to
 climate change and have interfered with and will continue to
 threaten and interfere with public rights in Boulder's
 communities. These rights include the right to use and enjoy
 public property, spaces, parks, and ecosystems; the right to
 public health, safety, emergency management, comfort, and
 well-being; and the right to safe and unobstructed travel,
 transportation, commerce, and exchange.
 
 
          ¶6
 In its private nuisance claim, Boulder alleges that
 defendants' actions have substantially and unreasonably
 interfered with, and will continue to substantially interfere
 with, Boulder's use and quiet enjoyment of its rights to
 and interests in its real property.
 
 
          ¶7
 In its trespass claim, Boulder alleges that defendants'
 actions have caused invasions of its property in the form of
 floodwaters, fires, hail, rain, snow, wind, and invasive
 species, all of which have caused substantial damage to
 Boulder's real property.
 
 7
 
          ¶8
 In its unjust enrichment claim, Boulder alleges that
 defendants have "profited from the manufacture,
 distribution and/or sales of fossil fuel products at levels
 sufficient to alter the climate, including in Colorado,"
 even after defendants were aware of the harms resulting from
 such actions. Boulder further contends that it has conferred
 a benefit on defendants by bearing the costs of the impacts
 of such climate change.
 
 
          ¶9
 Finally, in its civil conspiracy claim, Boulder alleges that
 defendants and other, unnamed co-conspirators acted in
 concert to maintain or increase fossil fuel usage at levels
 they knew were sufficient to alter the climate, while
 misrepresenting and failing to disclose material information
 concerning these activities.
 
 
          ¶10
 In connection with these causes of action, Boulder seeks
 monetary damages to compensate it for its past and future
 costs to mitigate the impacts of climate change, including
 the costs to analyze, evaluate, mitigate, abate, and
 otherwise remediate such impacts. These costs include,
 without limitation, costs associated with wildfire response,
 management, and mitigation; costs to repair and replace
 existing flood control and drainage measures and to repair
 flood damage; costs of managing and responding to increased
 drought conditions; and costs to repair physical damage to
 Boulder's buildings. Boulder does not, however, seek to
 enjoin
 
 8
 
 any oil and gas operations or sales in Colorado or elsewhere.
 Nor does it seek to enforce emissions controls of any kind.
 
 
          ¶11
 Boulder commenced its action in the Boulder County District
 Court. Shortly thereafter, however, defendants removed the
 case to federal district court, although, on Boulder's
 motion, the federal district court ordered the case remanded
 back to state court. Defendants appealed the federal
 court's remand order, and while their appeal was pending,
 they moved to dismiss the state court action for lack of
 personal jurisdiction and failure to state a claim. The
 Boulder County District Court, however, stayed the
 proceedings before it pending the resolution of the federal
 appeal.
 
 
          ¶12
 After substantial litigation in the Tenth Circuit and two
 certiorari petitions in the United States Supreme Court, the
 Tenth Circuit ultimately affirmed the federal district
 court's remand order, and this case resumed in the
 Boulder County District Court. See Bd. of Cnty.
 Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.)
 Inc., 25 F.4th 1238, 1246 (10th Cir. 2022).
 
 
          ¶13
 The Boulder County District Court then considered
 defendants' pending motions to dismiss. As pertinent
 here, in their motion to dismiss for failure to state a
 claim, defendants argued that Boulder's claims were
 "displaced" or otherwise preempted by federal law.
 
 9
 
          ¶14
 Specifically, defendants contended that Boulder's claims
 were governed by the federal common law of interstate
 pollution. Because federal legislation had displaced any
 federal common law right to impose liability based on fossil
 fuel emissions and production, however, defendants asserted
 that Boulder could not circumvent such federal legislation,
 and, thus, Boulder's federal common law claims were
 preempted.
 
 
          ¶15
 Next, defendants argued that the Clean Air Act
 ("CAA"), among other federal enactments, preempted
 Boulder's claims. On this point, defendants argued both
 field preemption (contending that Congress had occupied the
 field of emissions regulation) and conflict preemption
 (contending that Boulder's claims presented an obstacle
 to the enforcement of federal law because those claims would
 interfere with the careful balance struck by Congress between
 promoting fossil fuel production, on the one hand, and
 environmental protection, on the other).
 
 
          ¶16
 Finally, defendants contended that the federal foreign
 affairs power, which gives the federal government exclusive
 authority over foreign affairs, preempted Boulder's
 claims because, in defendants' view, those claims would
 impair the federal government's effective exercise of
 foreign policy.
 
 
          ¶17
 The district court ultimately rejected each of these
 contentions and denied defendants' motion to dismiss.
 
 10
 
          ¶18
 With respect to defendants' federal common law preemption
 argument, the district court disagreed with defendants'
 position for five reasons. First, in the district court's
 view, the CAA displaced the federal common law of nuisance
 governing transboundary pollution actions and, thus, federal
 common law in this area no longer exists. Second, even if the
 federal common law persisted, that law, which governed
 transboundary pollution actions, is distinct from
 Boulder's claims in the present case. Third, even if the
 CAA did not displace federal common law, the district court
 perceived no basis to recognize new federal common law
 covering Boulder's state law damages claims. Fourth,
 defendants had not shown a uniquely federal interest
 justifying the invocation of federal common law. And lastly,
 defendants had not shown a significant conflict between
 federal interests and Colorado law.
 
 
          ¶19
 As to defendants' contention that the CAA preempted
 Boulder's claims, the district court again was
 unpersuaded. In so ruling, the court observed that the CAA
 contains no language expressly preempting state common law
 tort claims. Nor, the court observed, does the CAA completely
 occupy the field of greenhouse gas ("GHG")
 emissions, a necessary predicate to a claim of field
 preemption. And the court was unpersuaded that Boulder's
 claims would impede the CAA's goals, thus undermining any
 claim of conflict preemption. On this point, the court
 observed that Boulder's claims, which seek damages and
 not an injunction, did
 
 11
 
 not pose an obstacle to the CAA's regulation of air
 pollution emissions. Moreover, the court deemed
 "notable" that the CAA does not provide a remedy to
 Boulder for the claims asserted here.
 
 
          ¶20
 Finally, the court rejected defendants' assertion that
 the foreign affairs power preempted Boulder's claims
 because the court found no precedent supporting preemption of
 claims like those at issue here and defendants had not shown
 how Boulder's claims would compromise the federal
 government's ability to conduct foreign policy.
 
 
          ¶21
 Defendants then petitioned this court for an order to show
 cause under C.A.R. 21, and we issued an order to show cause.
 
 
          II.
 Analysis
 
 
          ¶22
 We begin by addressing our jurisdiction under C.A.R. 21 and
 setting forth the applicable standard of review. We then turn
 to the question of whether Boulder's claims are preempted
 by federal law.
 
 
          A.
 Jurisdiction and Standard of Review
 
 
          ¶23
 The exercise of our original jurisdiction under C.A.R. 21
 lies within our sole discretion. People v. Tafoya,
 2019 CO 13, ¶ 13, 434 P.3d 1193, 1195. An original
 proceeding under C.A.R. 21 is an extraordinary remedy that is
 limited in its purpose and availability. Id. As
 pertinent here, we have exercised our discretion
 
 12
 
 under C.A.R. 21 to hear matters that present issues of
 significant public importance that we have not previously
 considered. Id.
 
 
          ¶24
 To date, we have not addressed the preemptive effect of
 federal law on state common law tort claims for harms related
 to climate change. Whether these claims may proceed against
 defendants has important implications for Colorado and its
 citizens. Moreover, other courts that have addressed similar
 questions have reached differing conclusions. Compare
 City & Cnty. of Honolulu v. Sunoco LP, 537 P.3d
 1173, 1181 (Haw. 2023) (concluding that claims like those at
 issue in this case were not preempted), with City of New
 York v. Chevron Corp., 993 F.3d 81, 85-86 (2d Cir. 2021)
 (concluding that claims like those at issue in this case were
 preempted). Thus, we believe that resolution of this issue
 warrants the exercise of our original jurisdiction under
 C.A.R. 21.
 
 
          ¶25
 We review a district court's ruling on a motion to
 dismiss de novo, and in doing so, we apply the same standards
 as the district court. Sch. Dist. No. 1 in City &
 Cnty. of Denver v. Masters, 2018 CO 18, ¶ 13, 413
 P.3d 723, 728. In conducting this review, we accept all
 allegations of material fact in the complaint as true, and we
 view the complaint's allegations in the light most
 favorable to the plaintiff. Id. To survive a motion
 to dismiss, a complaint must state a plausible claim for
 relief. Warne v. Hall, 2016 CO 50, ¶ 2, 373
 P.3d 588, 590.
 
 13
 
          B.
 Preemption
 
 
          ¶26
 Although the parties' briefs, in significant part, seem
 to talk past one another, the ultimate question before us is
 whether Boulder's claims are preempted by federal law. We
 conclude that they are not.
 
 
          1.
 Federal Common Law
 
 
          ¶27
 It is axiomatic that "[t]here is no federal general
 common law." Erie R.R. Co. v. Tompkins, 304
 U.S. 64, 78 (1938). The Supreme Court has, however,
 recognized narrower, more specialized areas of federal common
 law addressing matters within national legislative power, as
 directed by Congress and when the basic constitutional scheme
 so demands. Am. Elec. Power Co. v. Connecticut, 564
 U.S. 410, 421 (2011) ("AEP"). Such matters
 include disputes concerning the rights and obligations of the
 United States, interstate and international disputes
 implicating the conflicting rights of states or the United
 States's relations with foreign nations, and admiralty
 cases. Tex. Indus., Inc. v. Radcliff Materials,
 Inc., 451 U.S. 630, 641 (1981).
 
 
          ¶28
 One specific area of previously recognized federal common law
 that is pertinent to the matter now before us concerned
 "suits brought by one State to abate pollution emanating
 from another State." AEP, 564 U.S. at 421. In
 Illinois v. City of Milwaukee, 406 U.S. 91, 103
 (1972) ("Milwaukee I"), the Supreme Court
 explained, "When we deal with air and water in their
 ambient or interstate aspects,
 
 14
 
 there is a federal common law." Milwaukee I
 thus articulated a federal common law of "nuisance by
 water pollution" involving interstate or navigable
 waters. Id. at 99, 107. The Court noted, however,
 "It may happen that new federal laws and new federal
 regulations may in time pre-empt the field of federal common
 law of nuisance." Id. at 107.
 
 
          ¶29
 Shortly after Milwaukee I was decided, Congress
 enacted the Federal Water Pollution Control Act Amendments of
 1972, which "established a new system of regulation
 under which it is illegal for anyone to discharge pollutants
 into the Nation's waters except pursuant to a
 permit." City of Milwaukee v. Illinois, 451
 U.S. 304, 310-11 (1981) ("Milwaukee II").
 In light of this legislation, in Milwaukee II, the
 Supreme Court concluded that Congress had displaced the
 federal common law in this area. Id. at 317-19. In
 so concluding, the Court explained that "when Congress
 addresses a question previously governed by a decision rested
 on federal common law the need for such an unusual exercise
 of lawmaking by federal courts disappears." Id.
 at 314. The Court thus held that no federal common law remedy
 was available to respondents in the case before it.
 Id. at 332.
 
 
          ¶30
 The question remained, however, whether any federal common
 law concerning air pollution still existed. The
 Supreme Court addressed this issue in AEP, 564 U.S.
 at 415. There, the plaintiffs sued several electric power
 companies, asserting federal common law public nuisance
 claims and seeking to abate
 
 15
 
 defendants' carbon dioxide emissions. Id. The
 Court rejected such claims, holding that "the Clean Air
 Act and the EPA actions it authorizes displace[d] any federal
 common-law right to seek abatement of carbon-dioxide
 emissions from fossil-fuel fired powerplants."
 Id. at 424. The Court went on to explain, "In
 light of our holding that the Clean Air Act displaces federal
 common law, the availability vel non of a state
 lawsuit depends, inter alia, on the preemptive
 effect of the [CAA]." Id. at 429. Because none
 of the parties had briefed that issue, however, the Court
 declined to address it. Id.
 
 
          ¶31
 Since AEP was decided, courts have consistently
 reaffirmed its holding that the CAA displaced the federal
 common law of nuisance. See, e.g., Rhode Island
 v. Shell Oil Prods. Co., 35 F.4th 44, 55 (1st Cir.
 2022); Mayor & City Council of Baltimore v. BP
 P.L.C., 31 F.4th 178, 206 (4th Cir. 2022); Bd. of
 Cnty. Comm'rs of Boulder Cnty., 25 F.4th at 1260-61;
 Native Vill. of Kivalina v. ExxonMobil Corp., 696
 F.3d 849, 857 (9th Cir. 2012); Honolulu, 537 P.3d at
 1181.
 
 
          ¶32
 In line with this settled precedent, we, too, conclude that
 the CAA displaced the federal common law in this area, and,
 therefore, federal common law does not preempt Boulder's
 claims here. Instead, we must look to whether the CAA
 preempts Boulder's claims. See Honolulu, 537
 P.3d at 1199 ("Simply put, displaced federal common law
 plays no part in this court's preemption analysis. Once
 federal common law is displaced, the federal courts' task
 is to 'interpret and apply
 
 16
 
 statutory law.'") (quoting Nw. Airlines, Inc. v.
 Transp. Workers Union of Am., 451 U.S. 77, 95 n.34
 (1981)); accord Bd. of Cnty. Comm'rs of Boulder
 Cnty., 25 F.4th at 1261. We turn to that issue next.
 
 
          2.
 The CAA
 
 
          ¶33
 The Supremacy Clause of the United States Constitution
 provides that federal law "shall be the supreme Law of
 the Land; and the Judges in every State shall be bound
 thereby, any Thing in the Constitution or Laws of any State
 to the Contrary notwithstanding." U.S. Const. art. VI,
 cl. 2. Accordingly, it has long been settled that Congress
 has the power to preempt state law. Fuentes-Espinoza v.
 People, 2017 CO 98, ¶ 21, 408 P.3d 445, 448.
 
 
          ¶34
 In determining whether a state law is preempted, our analysis
 is guided by two tenets: (1) Congress's intent to preempt
 controls; and (2) courts will not presume that federal law
 supersedes the states' historic police powers unless the
 law reveals Congress's clear and manifest purpose to do
 so. Id. at ¶ 22, 408 P.3d at 448. This
 presumption against preemption applies with particular force
 when, as here, the law alleged to be preempted concerns a
 field that states have traditionally occupied. See Wyeth
 v. Levine, 555 U.S. 555, 565 &n.3 (2009); see
 also Rushing v. Kan. City S. Ry. Co., 185 F.3d 496, 510
 (5th Cir. 1999) (noting that courts interpreting federal
 statutes pertaining to subjects traditionally governed by
 state law are reluctant to find preemption and that
 "state common law traditionally
 
 17
 
 governs nuisances"). Case law has also suggested that
 "[t]he presence of a savings clause counsels against a
 finding that Congress intended to sweep aside all state
 claims in a particular area." Pinney v. Nokia,
 Inc., 402 F.3d 430, 450 (4th Cir. 2005).
 
 
          ¶35
 Against this backdrop, our case law has observed that federal
 preemption can take three forms: express preemption, field
 preemption, and conflict preemption.
 Fuentes-Espinoza, ¶ 23, 408 P.3d at 448.
 
 
          ¶36
 A state law is expressly preempted when a federal statute
 contains an express preemption provision. Id.
 
 
          ¶37
 A state law is preempted under principles of field preemption
 when Congress intended the federal government to occupy a
 field of law exclusively. English v. Gen. Elec. Co.,
 496 U.S. 72, 79 (1990). Such an intent may be inferred when
 (1) Congress has adopted a framework of regulation that is so
 pervasive that Congress has left no room for states to
 supplement it or (2) a federal interest is so dominant that
 the federal system will be assumed to preclude enforcement of
 state laws on the same subject. Fuentes-Espinoza,
 ¶ 25, 408 P.3d at 448.
 
 
          ¶38
 Finally, a state law is preempted under conflict preemption
 principles when a state law actually conflicts with federal
 law. English, 496 U.S. at 79. We have recognized two
 types of conflict preemption: impossibility preemption and
 obstacle preemption. Fuentes-Espinoza, ¶ 26,
 408 P.3d at 449. Impossibility preemption applies when (1)
 compliance with both federal and state law is
 
 18
 
 physically impossible, id.; (2) state law penalizes
 what federal law requires, see Geier v. Am. Honda Motor
 Co., 529 U.S. 861, 873 (2000); or (3) state law directly
 conflicts with federal law, see Am. Tel. &Tel. Co. v.
 Cent. Off. Tel., Inc., 524 U.S. 214, 227-28 (1998).
 Obstacle preemption, in turn, applies when the state law at
 issue stands as an obstacle to the accomplishment and
 execution of Congress's purposes and objectives.
 Fuentes-Espinoza, ¶ 26, 408 P.3d at 449.
 Notably, the Supreme Court has found obstacle preemption to
 apply in only a small number of cases, namely, when (1) the
 federal legislation at issue involves a uniquely federal area
 of regulation (e.g., foreign affairs, sanctioning fraud on
 federal agencies, and regulating maritime vessels) or (2)
 Congress has deliberately chosen to preclude state regulation
 because a federal law struck a particular balance of
 interests that would be disturbed or impeded by state
 regulation (e.g., when federal safety regulations sought a
 gradual phase-in of airbags but a state law required the
 immediate installation of such airbags). In re Volkswagen
 "Clean Diesel" Mktg., Sales Pracs., &Prods.
 Liab. Litig., 959 F.3d 1201, 1212-13 (9th Cir. 2020).
 
 
          ¶39
 None of these forms of preemption support a determination
 that the CAA preempts Boulder's claims in this case.
 
 
          ¶40
 Express preemption is not implicated because the CAA contains
 no provision expressly preempting state common law tort
 claims. Honolulu, 537 P.3d at 1203.
 
 19
 
          ¶41
 Similarly, field preemption is not implicated because, even
 if Boulder's claims could be construed as seeking to
 regulate emissions, which, as we explain below, they do not,
 Congress has not completely occupied the field of emissions
 regulation. Id. at 1204. To the contrary, under the
 CAA, states retain regulatory authority to implement,
 maintain, and enforce CAA emissions standards through state
 implementation plans. 42 U.S.C. § 7410;
 Honolulu, 537 P.3d at 1204. Moreover, "[t]he
 CAA contains two savings clauses that preserve state and
 local governments' legal right to impose standards and
 limitations on air pollution that are stricter than national
 requirements." Baltimore, 31 F.4th at 216
 (citing 42 U.S.C. §§ 7416, 7604(e)). Section 7416
 preserves "the right of any State or political
 subdivision thereof to adopt or enforce (1) any standard or
 limitation respecting emissions of air pollutants or (2) any
 requirement respecting control or abatement of air
 pollution," as long as the standards are no less
 stringent than the CAA. Section 7604(e), in turn, preserves
 "any right which any person (or class of persons) may
 have under any statute or common law to seek enforcement of
 any emission standard or limitation or to seek any other
 relief." Thus, the CAA does not completely occupy the
 field of emissions regulation, and Boulder's claims are
 not barred under field preemption principles.
 
 
          ¶42
 Lastly, Boulder's claims are not barred under conflict
 preemption principles. Impossibility preemption is
 inapplicable because defendants have not
 
 20
 
 cited, nor have we seen, any facts to indicate that it is
 impossible to comply with both the CAA and state tort law,
 that state tort law penalizes what the CAA requires, or that
 state tort law directly conflicts with the CAA.
 Honolulu, 537 P.3d at 1207 (concluding that
 impossibility preemption did not apply to claims similar to
 those presented here).
 
 
          ¶43
 Obstacle preemption is likewise inapplicable. Defendants have
 not identified any way in which state tort liability would
 frustrate the CAA's purposes, and we perceive none. The
 CAA itself makes clear that "air pollution prevention .
 . . and air pollution control at its source is [sic] the
 primary responsibility of States and local governments."
 42 U.S.C. § 7401(a)(3). Moreover, the CAA's
 legislative declaration provides that one of the CAA's
 principal purposes is to protect and enhance the quality of
 this country's air resources in order to promote the
 public health and welfare, as well as the productive capacity
 of our population. 42 U.S.C. § 7401(b). The CAA
 primarily achieves these goals by "regulat[ing]
 pollution-generating emissions from both stationary sources,
 such as factories and powerplants, and moving sources, such
 as cars, trucks, and aircraft." Util. Air Regul.
 Grp. v. EPA, 573 U.S. 302, 308 (2014). Nothing in
 Boulder's damages claims would interfere with these
 purposes.
 
 
          ¶44
 Nor do Boulder's claims involve uniquely federal areas of
 regulation. To the contrary, nuisance abatement issues and
 the other torts that Boulder has
 
 21
 
 alleged in this case have been deemed traditional
 state law matters implicating important state
 interests. See, e.g., Lambeth v. Miller,
 363 Fed.Appx. 565, 568 (10th Cir. 2010) (unpublished opinion)
 (addressing nuisance abatement issues); Rushing, 185
 F.3d at 510 (addressing nuisance actions); Freeman v.
 Grain Processing Corp., 848 N.W.2d 58, 76 (Iowa 2014)
 (addressing nuisance, negligence, and trespass claims). And
 litigating Boulder's claims would not upset any balance
 set by Congress because Boulder's claims do not seek to
 impose liability for activities that the CAA regulates.
 See Baltimore, 31 F.4th at 216 (concluding that tort
 claims similar to those presented here did not involve the
 regulation of emissions); accord Honolulu, 537 P.3d
 at 1205.
 
 
          ¶45
 On each of these points, the Hawai'i Supreme Court's
 decision in Honolulu, 537 P.3d at 1195-1207, is
 substantially on point. There, the City and County of
 Honolulu brought damages claims for public nuisance, private
 nuisance, strict liability failure to warn, negligent failure
 to warn, and trespass against a number of oil and gas
 producers. Id. at 1180. The defendants there made
 many of the same preemption arguments that defendants make
 here. Id. at 1181. The court rejected each of these
 arguments, however, concluding, first, that the CAA displaced
 federal common law governing interstate pollution damages
 suits and, thereafter, federal common law did not preempt
 state law. Id. at 1181, 1195-1202. The court then
 proceeded to address whether the CAA preempted the
 plaintiffs' claims and
 
 22
 
 concluded, along the same lines discussed above, that it did
 not. Id. at 1181-82, 1202-07.
 
 
          ¶46
 The Fourth Circuit reached the same conclusions on these
 preemption questions, albeit in a different procedural
 context, in Baltimore, 31 F.4th at 204-07, 215-17.
 
 
          ¶47
 The analyses in these cases mirror our own, and we find the
 cases persuasive and thus follow them here.
 
 
          ¶48
 Accordingly, we conclude that Boulder's claims are not
 preempted by either federal common law or the CAA. In so
 concluding, we are not persuaded by defendants' myriad
 arguments to the contrary. We end by addressing those
 arguments.
 
 
          3.
 Defendants' Contentions
 
 
          ¶49
 Defendants principally appear to contend that Boulder's
 state law claims assert what were formerly federal common law
 claims involving interstate pollution and although federal
 legislation has since displaced the federal common law in
 this area, federal common law or federalism concerns arising
 from the United States Constitution continue to operate to
 bar Boulder's claims. We disagree.
 
 
          ¶50
 As an initial matter, it is unclear whether the essential
 premise of defendants' argument is correct. Specifically,
 although defendants assert that the
 
 23
 
 federal common law would have governed Boulder's claims,
 that does not appear to be accurate. As discussed above, the
 federal common law applied to "suits brought by one
 State to abate pollution emanating from another
 State," and such actions involved claims against the
 pollution emitters themselves, thus implicating the
 regulation of interstate pollution. AEP, 564 U.S. at
 418, 421 (emphasis added); see also Milwaukee I, 406
 U.S. at 93, 104 (discussing "[t]he application of
 federal common law to abate a public nuisance in interstate
 or navigable waters"). Boulder, however, has not brought
 an action against a pollution emitter to abate pollution.
 Rather, it seeks damages from upstream producers for harms
 stemming from the production and sale of fossil fuels.
 Defendants cite no Supreme Court case in which the Court
 applied the federal common law in this setting. Accordingly,
 even if the federal common law in this area still existed, it
 would not appear to apply here. See Honolulu, 537
 P.3d at 1201.
 
 
          ¶51
 Even accepting defendants' premise that the prior federal
 common law would have governed Boulder's claims, however,
 defendants cite no applicable authority supporting the
 proposition that once federal common law exists, the
 structure of the Constitution precludes the application of
 state law even when that common law no longer exists. The
 cases on which defendants rely for this theory do not support
 it. For example, defendants assert that Franchise Tax
 Board v. Hyatt, 587 U.S. 230, 246 (2019), where the
 Court said that the Constitution implicitly
 
 24
 
 forbids states from applying their own laws in matters
 involving interstate controversies, supports their position.
 But in that case, the issue presented was "whether the
 Constitution permits a State to be sued by a private party
 without its consent in the courts of a different State."
 Id. at 233. No such issue of state sovereignty is
 presented in this case. Nor does this case involve a
 state's applying its own law in an interstate controversy
 that is necessarily controlled by federal law.
 
 
          ¶52
 At root, defendants appear to be arguing that a vague federal
 interest over interstate pollution, climate change, and
 energy policy must preempt Boulder's claims. As the
 Supreme Court explained in Virginia Uranium, Inc. v.
 Warren, 587 U.S. 761, 767 (2019) (plurality opinion),
 however, "Invoking some brooding federal interest or
 appealing to a judicial policy preference should never be
 enough to win preemption of a state law; a litigant must
 point specifically to 'a constitutional text or a federal
 statute' that does the displacing or conflicts with state
 law." (Quoting Puerto Rico Dep't of Consumer
 Affs. v. Isla Petroleum Corp., 485 U.S. 495, 503
 (1988)). Here, defendants point to no federal statute or
 constitutional text that preempts Boulder's state law
 claims, and "[t]here is no federal pre-emption in
 vacuo, without a constitutional text or a federal
 statute to assert it." Puerto Rico Dep't of
 Consumer Affs., 485 U.S. at 503.
 
 25
 
          ¶53
 Nor are we persuaded by defendants' argument that state
 law claims previously preempted by federal common law may
 proceed only to the extent authorized by federal statute. For
 the reasons discussed above, we are not convinced that
 federal common law would have barred Boulder's claims
 here. Even accepting, for purposes of argument, the contrary
 premise, however, we are still unconvinced. In support of
 their position, defendants principally rely on
 International Paper Co. v. Ouellette, 479 U.S. 481,
 492 (1987), City of New York, 993 F.3d at 99, and
 People of State of Illinois v. City of Milwaukee,
 731 F.2d 403, 411 (7th Cir. 1984) ("Milwaukee
 III"). These cases are either inapposite or
 unconvincing.
 
 
          ¶54
 The question presented in Ouellette, 479 U.S. at
 491, was whether the Clean Water Act preempted Vermont common
 law to the extent that that law might impose liability on a
 New York point source. In addressing this question, the Court
 began by noting the pervasive program of water pollution
 regulation set forth in the Clean Water Act and then turned
 to the preemption question presented. Id. at 492. It
 is in that context that the Court observed that "the
 only state suits that remain available are those specifically
 preserved by the Act," and the Court made this statement
 by way of introducing the very type of preemption analysis
 that we have conducted above. Id. at 492-97.
 Accordingly, when read in context, the Court's statement,
 on which defendants heavily rely, merely posed
 
 26
 
 the question of whether the state nuisance action at issue
 was preempted by the Clean Water Act. The Court did not, as
 defendants suggest, require express authorization of a state
 common law action in the Act itself. Had it done so, it would
 have had no need to conduct the extensive preemption analysis
 that followed its statement.
 
 
          ¶55
 In City of New York, 993 F.3d at 99, the Second
 Circuit opined that state common law tort claims similar to
 those at issue here were preempted because they would have
 been governed by the federal common law and
 "'resort[ing] to state law' on a question
 previously governed by federal common law is permissible only
 to the extent 'authorize[d]' by federal
 statute." (Alterations in original) (quoting
 Milwaukee III, 731 F.2d at 411.) As the Hawai'i
 Supreme Court stated in Honolulu, 537 P.3d at 1199,
 however, the Second Circuit's preemption analysis
 "engages in backwards reasoning."
 
 
          ¶56
 The Second Circuit first analyzed whether federal common law
 would have preempted New York's state law claims, and the
 court concluded that it would have done so. City of New
 York, 993 F.3d at 90-95. The court then turned to the
 question of whether the CAA preempted the federal common law,
 and after concluding that it did, the court opined that the
 CAA's displacement of the federal common law did not
 resuscitate New York's state law claims. Id. at
 95-99. Accordingly, in the Second Circuit's view, federal
 common law barred New York's
 
 27
 
 state law claims, and although the CAA displaced that federal
 common law, the common law retained its preemptive force.
 
 
          ¶57
 Unlike the Second Circuit, for the reasons set forth above,
 we believe that the proper analysis is for a court first to
 determine whether any federal common law exists at all
 because "displaced federal common law plays no part in
 this court's preemption analysis."
 Honolulu, 537 P.3d at 1199. If the court finds that
 federal legislation has displaced federal common law, then
 the court looks to whether the legislation preempted state
 law claims. Thus, contrary to the Second Circuit's
 conclusions, which mirrored those of the Seventh Circuit in
 Milwaukee III, 731 F.2d at 411, the Supreme Court
 explained in AEP, 564 U.S. at 429, that after
 displacement of federal common law by statute, "the
 availability vel non of a state lawsuit depends,
 inter alia, on the preemptive effect of the federal
 Act." At no point did the Supreme Court suggest that the
 federal statute must specifically authorize claims under
 state law. Id. Thus, defendants' reliance on
 City of New York and Milwaukee III is
 likewise misplaced.
 
 
          ¶58
 For similar reasons, we reject defendants' contention
 that Boulder's action is, in essence, an attempt to
 regulate GHG emissions and is therefore preempted. As a
 factual matter, Boulder's claims do not seek to regulate
 GHG emissions (the claims do not seek compensation for any
 GHG emissions by defendants themselves but rather focus on
 defendants' upstream production activities).
 
 28
 
 Rather, they seek compensation for allegedly tortious conduct
 that the CAA does not address. See Baltimore, 31
 F.4th at 216 (concluding, in circumstances similar to those
 present here, that the plaintiffs' state law claims did
 not involve the regulation of emissions); Honolulu,
 537 P.3d at 1205 (concluding that because the plaintiffs'
 state law claims did not seek to regulate emissions, those
 claims did not conflict with the CAA).
 
 
          ¶59
 On this point, we are not persuaded by defendants'
 reliance on Kurns v. Railroad Friction Products
 Corp., 565 U.S. 625, 637 (2012). In Kurns, the
 Supreme Court observed that "'regulation can be . .
 . effectively exerted through an award of damages,' and
 '[t]he obligation to pay compensation can be, indeed is
 designed to be, a potent method of governing conduct and
 controlling policy.'" Id. (omission and
 alteration in original) (quoting San Diego Bldg. Trades
 Council v. Garmon, 359 U.S. 236, 247 (1959)). The
 Kurns Court made this statement, however, in the
 context of rejecting the plaintiffs' assertion that
 although the Locomotive Inspection Act occupied the entire
 field of locomotive equipment regulation, that Act's
 preemptive scope did not extend to state common law claims,
 as opposed to state legislation or regulation. Id.
 The case before us presents no similar question as to whether
 Boulder may assert common law claims in an area in which
 Congress has chosen to occupy the field. Moreover, accepting
 defendants' argument that a large damages award is
 equivalent to regulation and thus must
 
 29
 
 be preempted could lead to the preemption of many traditional
 state law tort claims simply because they might lead
 to a large damages award. See Honolulu, 537 P.3d at
 1202. But a lawsuit does not amount to regulation merely
 because it might have an impact on how actors in a
 given field behave. See id.
 
 
          ¶60
 Finally, we are unpersuaded by defendants' argument that
 the federal foreign affairs power bars Boulder's claims.
 
 
          ¶61
 The Supreme Court has interpreted the United States
 Constitution to vest power over foreign affairs exclusively
 with the federal government. United States v. Pink,
 315 U.S. 203, 233 (1942); Hines v. Davidowitz, 312
 U.S. 52, 63 (1941). The foreign affairs power may thus
 preempt state laws that intrude on the federal
 government's exclusive power over foreign affairs.
 Zschernig v. Miller, 389 U.S. 429, 440-41 (1968).
 
 
          ¶62
 In this context, the Supreme Court has observed that the
 foreign affairs power may preempt state laws via either
 conflict preemption or field preemption. Am. Ins.
 Ass'n v. Garamendi, 539 U.S. 396, 419-20, 419 n.11
 (2003); see also Movsesian v. Victoria Versicherung
 AG, 670 F.3d 1067, 1071 (9th Cir. 2012) (relying on
 Garamendi). But neither applies here.
 
 
          ¶63
 Boulder's claims are not barred by principles of conflict
 preemption because defendants do not identify any express
 foreign policy of the federal government that conflicts with
 state tort law, and we are not aware of any. Nor do
 defendants
 
 30
 
 indicate how Boulder's claims pose an obstacle to our
 federal government's dealings with any foreign nation.
 See Baltimore, 31 F.4th at 213-14 (concluding that
 Baltimore's state law claims, which are similar to
 Boulder's claims in the present case, were not barred by
 foreign affairs conflict preemption because the defendants
 had not identified any express foreign policy that conflicted
 with Baltimore's state law claims, nor had the defendants
 shown that Baltimore's claims posed an obstacle to the
 federal government's dealings with foreign nations).
 
 
          ¶64
 As to field preemption, in the context of foreign affairs,
 courts have concluded that state laws may be barred if they
 "intrude[] on the field of foreign affairs without
 addressing a traditional state responsibility."
 Movsesian, 670 F.3d at 1072. Although the doctrine
 of foreign affairs field preemption is "rarely
 invoked," id. at 1075, the Supreme Court has
 observed that it applies in instances when a state
 effectively attempts to establish its own foreign policy or
 when a state law has more than some incidental effect on
 foreign affairs, see Zschernig, 389 U.S. at 434,
 441.
 
 
          ¶65
 In Movsesian, 670 F.3d at 1071-77, the Ninth Circuit
 applied a two-step analysis that it had articulated in its
 prior case law to determine whether the foreign affairs power
 preempted a state statute. Under this analysis, a court must
 first ask whether the state law "concerned an area of
 traditional state responsibility," which required the
 court to inquire into the statute's "real
 
 31
 
 purpose." Id. at 1074. If the statute at issue
 did not address an area of traditional state responsibility,
 then the court must consider whether the statute
 "intruded on a power expressly or impliedly reserved by
 the Constitution to the federal government."
 Id. In the case before it, the court concluded that
 the state statute at issue did not concern an area of
 traditional state responsibility and that the statute
 intruded on the federal government's exclusive powers by
 having more than an incidental or indirect effect on foreign
 affairs. Id. at 1075-76. Accordingly, the statute
 was preempted. Id. at 1077.
 
 
          ¶66
 Applying these principles here, we conclude that
 Boulder's claims are not barred by foreign affairs field
 preemption. As discussed above, the torts alleged in this
 case involve areas of traditional state responsibility.
 Moreover, we perceive no manner in which, through its tort
 claims, Boulder is seeking to implement foreign policy. Nor
 have defendants demonstrated how Boulder's claims intrude
 on any power over foreign policy expressly or implicitly
 reserved to the federal government.
 
 
          ¶67
 In so concluding, we are not persuaded by defendants'
 assertion that allowing this action to proceed would impair
 the effective exercise of this country's foreign policy
 by regulating global GHG emissions. As discussed above,
 Boulder's claims do not seek to regulate GHG emissions.
 See Baltimore, 31 F.4th at 214 (concluding that
 Baltimore's state law claims, which are similar to
 Boulder's
 
 32
 
 claims in this case, were not field preempted by the foreign
 affairs power because those claims did not involve any
 allegations that developed foreign policies with other
 countries and did not undermine the federal government in the
 international arena but, at best, involved an intersection
 between state law and private, international companies).
 
 
          ¶68
 In sum, defendants' arguments do not convince us that
 federal law preempts Boulder's state law claims in this
 case.
 
 
          III.
 Conclusion
 
 
          ¶69
 For these reasons, we conclude that the district court
 correctly concluded that federal law did not preempt
 Boulder's claims and that those claims could therefore
 proceed under state law.
 
 
          ¶70
 Accordingly, we discharge the order to show cause and remand
 this case to the district court for further proceedings
 consistent with this opinion. In so ruling, we express no
 opinion on the ultimate viability of the merits of
 Boulder's claims.
 
 
          
 JUSTICE SAMOUR, joined by JUSTICE BOATRIGHT, dissented.
 
 33
 
          
 JUSTICE SAMOUR, joined by JUSTICE BOATRIGHT, dissenting.
 
 
          ¶71
 The Pledge of Allegiance states that the United States of
 America is "one Nation under God, indivisible." 4
 U.S.C. § 4. This language was particularly meaningful
 when it was initially conceived in 1892 because, prior to the
 Civil War, the question of whether a state could withdraw
 from the Union had been hotly debated and remained
 unresolved. See Elk Grove Unified Sch. Dist. v.
 Newdow, 542 U.S. 1, 6 n.1 (2004). Of course, in 2025,
 there is no dispute about our status: We are but one
 indivisible nation. Yet, the majority in this case gives
 Boulder, Colorado, the green light to act as its own
 republic.[1] More specifically, the majority concludes
 that Boulder may prosecute state-law claims that will both
 effectively regulate interstate air pollution and have more
 than an incidental effect on foreign affairs. And,
 alarmingly, the majority's decision isn't cabined to
 Boulder -all other Colorado municipalities may bring such
 claims. Indeed, at least one already has. See Comm'rs
 of San Miguel Cnty. v. Suncor Energy, No. 21CV150 (Dist.
 Ct., City &Cnty. of Denver).
 
 
          ¶72
 Boulder's damages claims against Exxon Mobil Corporation
 and three Suncor Energy companies (collectively, "the
 energy companies") are based on harms the State of
 Colorado has allegedly suffered as a result of
 global climate
 
 34
 
 change. According to Boulder, by producing, promoting,
 refining, marketing, and selling fossil fuels in the United
 States and globally, the energy companies have played and
 continue to play a substantial role in increasing the
 concentration of greenhouse gases ("GHGs") in the
 atmosphere, thereby inducing changes to the climate
 worldwide. The majority decides that, since any federal
 common law in this area was displaced by the Clean Air Act
 ("CAA"), the appropriate test to determine whether
 Boulder's state-law claims may proceed is one of ordinary
 statutory preemption. Maj. op. ¶ 32. After analyzing the
 claims under that ill-suited framework, the majority holds
 that the CAA does not preempt them. Id. at ¶ 2;
 see also City & Cnty. of Honolulu v. Sunoco LP,
 537 P.3d 1173, 1199-1203 (Haw. 2023).
 
 
          ¶73
 But ordinary preemption in this case fits like a shoe three
 sizes too small. State law has historically been incompetent
 to address claims seeking redress for interstate and
 international air pollution-for good reason: Such claims
 implicate "uniquely federal interests," Boyle
 v. United Techs. Corp., 487 U.S. 500, 504 (1988)
 (quoting Tex. Indus., Inc. v. Radcliff Materials,
 Inc., 451 U.S. 630, 640 (1981)), necessitating a
 "uniform rule of decision," Illinois v. City of
 Milwaukee, 406 U.S. 91, 105 n.6 (1972)
 ("Milwaukee I"). Had Boulder's
 state-law claims been raised prior to the CAA's
 enactment, they would have been precluded under federal
 common law.
 
 35
 
          ¶74
 And simply because federal common law relating to GHG
 emissions has been displaced by statute doesn't mean that
 the conditions that made state law inappropriate to govern
 these claims in the past have vanished into thin air. In
 other words, Congress's decision to displace federal
 common law and to take control of this area did not suddenly
 render state law competent to regulate interstate and
 international air pollution. Nothing in the CAA reflects that
 Congress intended the result the majority reaches here.
 
 
          ¶75
 Because state law remains incompetent to regulate interstate
 and international air pollution, I disagree that Boulder can
 prosecute its claims. Unlike the Blue Fairy that brought
 Pinocchio to life, the CAA did not magically breathe life
 into state-law tort claims that had been as lifeless as a
 wooden puppet.
 
 
          ¶76
 Notably, an ordinary preemption analysis includes a
 presumption against preemption because it applies in cases in
 which state law has traditionally occupied the field. In such
 cases, I can understand why a presumption against preemption
 makes sense. In a case like this one, however, where state
 law has not traditionally occupied the field, the
 presumption is counterintuitive.
 
 
          ¶77
 In the end, the majority arrives at the wrong result because
 it applies the wrong test. And, in doing so, the majority
 disregards the principles underlying federal common law that
 made state law incompetent to govern in this area in the
 first place. See Maj. op. ¶ 32. Indeed, the
 majority deems federal common law
 
 36
 
 completely irrelevant to the analysis and thus treats it as
 though it never existed. Id. Unlike the majority, I
 don't read our Supreme Court's relevant jurisprudence
 as supporting that approach.
 
 
          ¶78
 In my view, the appropriate inquiry with respect to the
 interstate aspect of Boulder's claims is whether the CAA
 affirmatively authorizes them. See City of New York v.
 Chevron Corp., 993 F.3d 81, 99 (2d Cir. 2021) (holding,
 in a similar case, that the CAA doesn't
 "authorize" state-law claims). I would conclude
 that it does not. And, as it relates to the international
 aspect of Boulder's claims, I would conclude that the
 federal government's primacy in foreign affairs precludes
 them. I would thus dismiss all of Boulder's claims.
 
 
          ¶79
 I am concerned that permitting Boulder to proceed with its
 claims will interfere with both our federal government's
 regulation of interstate air pollution and our federal
 government's foreign policies regarding air pollution.
 Because there are numerous other local governments within the
 United States doing just what Boulder has done (and yet
 others that will undoubtedly follow suit in the future), and
 because multiple out-of-state courts have now reached the
 conclusion my colleagues in the majority do in this case, I
 am worried that we are headed for regulatory chaos.
 Considering that ours is "one [indivisible]
 Nation," I don't believe that this free-for-all
 approach is what our Supreme Court intended in the cases
 cited by the majority.
 
 37
 
          ¶80
 I would make the order to show cause absolute and nip
 Boulder's state-law claims in the bud. Therefore, I
 respectfully dissent.
 
 
          I.
 Federal Common Law Historically Governing Interstate Air
 Pollution Disputes Is Not Distinguishable
 
 
          ¶81
 My jumping-off place is a discussion of federal common law
 because it remains relevant after its displacement by the
 CAA. There are compelling reasons why interstate air
 pollution has not historically been a state-law field, and
 those reasons remain true after the enactment of the CAA. The
 majority skips over this important step in the analysis
 because it mistakenly reviews the question before us under
 ordinary preemption. However, since interstate air pollution
 is a field the states have not traditionally occupied,
 ordinary preemption is a fish out of water. And, as I show in
 this section, the majority's attempt to otherwise
 distinguish federal common law is futile.
 
 
          ¶82
 "There is no federal general common law." Erie
 R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). However,
 federal courts have developed common law in limited,
 specialized areas involving "'uniquely federal
 interests'" that "are so committed by the
 Constitution and laws of the United States to federal control
 that state law is pre-empted and replaced, where necessary,
 by federal law of a content prescribed (absent explicit
 statutory directive) by the courts." Boyle, 487
 U.S. at 504 (quoting Tex. Indus., Inc., 451 U.S. at
 640).
 
 38
 
          ¶83
 Where there is federal common law, the application of state
 law is precluded. See City of Milwaukee v. Illinois,
 451 U.S. 304, 313 n.7 (1981) ("Milwaukee
 II"). Disputes in these narrow categories cannot
 "be resolved under state law, either because the
 authority and duties of the United States as sovereign are
 intimately involved or because the interstate or
 international nature of the controversy makes it
 inappropriate for state law to control." Tex.
 Indus., Inc., 451 U.S. at 641. Accordingly, there
 "must be a conflict between [a] federal interest and . .
 . state law" to justify the development of federal
 common law. City of New York, 993 F.3d at 90. But
 that conflict need not be "as sharp as that which must
 exist for ordinary pre-emption when Congress legislates
 'in a field which the [s]tates have traditionally
 occupied.'" Boyle, 487 U.S. at 507
 (emphasis added) (quoting Rice v. Santa Fe Elevator
 Corp., 331 U.S. 218, 230 (1947)).
 
 
          ¶84
 The control of "ambient or interstate" air and
 water pollution was, historically, one of those inherently
 federal categories that was governed by federal common law
 and where state law could not apply. Milwaukee I,
 406 U.S. at 103; see also Int'l Paper Co. v.
 Ouellette, 479 U.S. 481, 492 (1987) ("[T]he control
 of interstate pollution is primarily a matter of federal
 law."). In fact, the Supreme Court has recognized that
 "[e]nvironmental protection," in general, "is
 undoubtedly an area 'within national legislative
 power,' one in which federal courts may fill in
 'statutory interstices,' and, if necessary, even
 'fashion federal
 
 39
 
 law.'" Am. Elec. Power Co. v. Connecticut,
 564 U.S. 410, 421 (2011) ("AEP") (quoting
 Henry J. Friendly, In Praise of Erie-And of the
 New Federal Common Law, 39 N.Y.U. L. Rev. 383, 421-22
 (1964)). Fashioning federal common law was certainly
 necessary to address transboundary pollution. See
 Milwaukee I, 406 U.S. at 105 n.6.
 
 
          ¶85
 Prior to the enactment of the CAA and the Clean Water Act
 ("CWA"), federal courts employed federal common law
 to resolve numerous suits brought by one state to abate
 pollution originating from another state. See, e.g.,
 id. at 107-08 (remitting to the district court, with
 instructions to apply federal common law, a public nuisance
 suit brought by Illinois to abate pollution discharges into
 Lake Michigan); Georgia v. Tenn. Copper Co., 240
 U.S. 650, 650-51 (1916) (ordering a private copper company in
 Tennessee to limit sulfur emissions that caused harm in
 Georgia); Missouri v. Illinois, 180 U.S. 208, 241-43
 (1901) (allowing Missouri to sue to enjoin Chicago from
 discharging sewage into interstate waters); see also City
 of New York, 993 F.3d at 91 (listing "a mostly
 unbroken string of cases [that] applied federal law to
 disputes involving interstate air or water pollution").
 They did so based on "an overriding federal interest in
 the need for a uniform rule of decision" or because the
 controversy in question "touche[d] basic interests of
 federalism." Milwaukee I, 406 U.S. at 105 n.6.
 
 
          ¶86
 The interstate nature of the alleged pollution in the
 above-referenced cases constituted an overriding federal
 interest necessitating "a uniform rule of
 
 40
 
 decision." See id. (explaining that "the
 pollution of a body of water such as Lake Michigan bounded,
 as it is, by four States" presents "demands for
 applying federal law"); Tex. Indus., Inc., 451
 U.S. at 641 (noting that "the interstate or
 international nature of [a] controversy [can] make[] it
 inappropriate for state law to control"). Air pollution
 and water pollution both can move across state boundaries
 without difficulty and are not always easy to track, making
 their governance by different local standards difficult, if
 not downright impossible.
 
 
          ¶87
 Before the CAA saw the light of day, federal common law
 conflicted with, and precluded, state-law claims to redress
 interstate air pollution. For that reason, Boulder could not
 have brought its claims under federal common law.
 
 
          ¶88
 But Boulder whistles past the federal-common-law graveyard,
 maintaining that its claims are distinguishable from those
 which federal common law historically dealt with in the
 interstate pollution arena. I disagree.
 
 
          ¶89
 True, the historical interstate air pollution case law
 developed by federal courts did not focus on GHG emissions
 specifically. But GHG emissions certainly possess the
 "ambient" and "interstate" character that
 would have necessitated, and still does necessitate, "a
 uniform rule of decision." Milwaukee I, 406
 U.S. at 103, 105 n.6. In fact, GHG emissions may be the most
 "interstate" type of air pollution there is, given
 the emissions' ubiquitous nature, sources, and harms.
 
 41
 
 See California v. BP P.L.C., Nos. C 17-06011-WHA
 &C 17-06012-WHA, 2018 WL 1064293, at *3 (N.D. Cal. Feb.
 27, 2018) ("If ever a problem cried out for a uniform
 and comprehensive solution, it is the geophysical problem [of
 climate change], a problem centuries in the making
 ...."), vacated and remanded, City of
 Oakland v. BP PLC, 969 F.3d 895 (9th Cir. 2020).
 
 
          ¶90
 Like the district court, however, my colleagues in the
 majority try to sideline federal common law by concluding
 that Boulder is not seeking to "abate" or regulate
 out-of-state GHG emissions. Maj. op. ¶ 50. I beg to
 differ. The majority's attempt to differentiate between
 what it perceives as the scope of historical federal common
 law-abatement suits that regulate interstate air
 pollution-and Boulder's suit-which the majority perceives
 as a modest tort action for monetary remediation-falls short.
 See id. The thrust of this contention is that a tort
 suit for damages does not implicate the distinctive federal
 interests that a suit more explicitly regulating out-of-state
 air pollution does. And therefore, the argument goes, there
 is no need for a "uniform rule of decision" in this
 area. Milwaukee I, 406 U.S. at 105 n.6.
 
 
          ¶91
 While Boulder's state-law claims masquerade as tort
 claims for damages, a closer look at the substance of those
 claims' allegations reveals that Boulder seeks to
 effectively abate or regulate interstate emissions. See
 City of Boulder v. Pub. Serv. Co. of Colo., 2018 CO 59,
 ¶ 20, 420 P.3d 289, 294 ("[W]e must look to the
 substance, not the form, of [the] complaint."). To
 start, Boulder's allegations undoubtably
 
 42
 
 concern interstate GHG emissions. I recognize that Boulder
 emphasizes in its amended complaint that it "do[es] not
 seek to . . . enforce emissions controls of any kind."
 But in the next breath, Boulder acknowledges, as it must,
 that its alleged damages stem directly from such emissions.
 Boulder has sued the energy companies for the role their
 fossil fuel production and sales allegedly "played and
 continue[] to play in causing . . . alteration of the
 climate." (Emphasis added.) The causal link between
 the energy companies' actions and Boulder's alleged
 damages is global GHG emissions. As the Second Circuit
 observed, "Artful pleading cannot transform the . . .
 complaint into anything other than a suit over global [GHG]
 emissions. It is precisely because fossil fuels emit
 [GHGs]-which collectively 'exacerbate global
 warming'-that the City is seeking damages." City
 of New York, 993 F.3d at 91. This applies with equal
 force to Boulder's suit here.
 
 
          ¶92
 In yet another attempt to treat federal common law as chopped
 liver, the majority, Maj. op. ¶ 50, and Boulder
 characterize the claims as not being against
 emitters, to which federal common law has applied in
 the past, but rather against companies higher in the chain of
 production. However, that distinction is neither here nor
 there-the bottom line is that this suit is about the
 alleged GHG emissions from the energy companies,
 even if the energy companies are actually a few steps removed
 from the physical release of the pollutants.
 
 43
 
          ¶93
 Further stripping away the amended complaint's clever
 language confirms that this case is about abating and
 regulating global emissions. The amended complaint explicitly
 states that the energy companies "continue to
 conduct their fossil fuel activities at levels that
 contribute to alteration of the climate, including in
 Colorado, and do not plan to stop or substantially
 reduce those activities." (Emphases added.) It then
 requests, among other things, "remediation and/or
 abatement of the hazards discussed above by [the
 energy companies] by any other practical means."
 (Emphasis added.)
 
 
          ¶94
 Boulder's requested relief will inevitably impose a
 limitation on GHG emissions. An award of damages, just like
 abatement, can "effectively exert[]" regulation, no
 matter how the relief is framed or viewed. Kurns v. R.R.
 Friction Prods. Corp., 565 U.S. 625, 637 (2012) (quoting
 San Diego Bldg. Trades Council v. Garmon, 359 U.S.
 236, 247 (1959)). The "obligation to pay compensation
 can be, indeed is designed to be, a potent method of
 governing conduct and controlling policy." Id.
 (quoting Garmon, 359 U.S. at 247); see also
 Ouellette, 479 U.S. at 498 n.19 (declining "to draw
 a line" between different types of relief in evaluating
 the preemptive scope of the CWA because, as a result of the
 assessed damages, a party "might be compelled to adopt
 different or additional means of pollution control from those
 required by the [CWA], regardless of whether the purpose of
 the relief
 
 44
 
 was compensatory or regulatory"). Make no mistake:
 Boulder looks to curb the energy companies' conduct by
 hitting them where it hurts -their wallets.
 
 
          ¶95
 In short, Boulder's claims target GHG emissions from the
 energy companies with a goal that's beyond compensatory.
 Therefore, I disagree with the majority that "Boulder .
 . . has not brought an action . . . to abate pollution"
 and that this case is not similar, in relevant ways, to cases
 historically governed by federal common law. Maj. op. ¶
 50. Try as it might, the majority cannot distance this case
 from federal common law.[2] And, as I explain next, federal common
 law remains relevant to the analysis after the enactment of
 the CAA. The majority's failure to apprehend this is what
 ultimately leads it astray: It forces a square peg in a round
 hole by applying an ordinary preemption analysis.
 
 
          II.
 The Appropriate Analysis Is Whether the CAA Authorizes
 Boulder's Claims Relating to Interstate GHG
 Emissions
 
 
          ¶96
 I agree with my colleagues in the majority that federal
 common law in this area has been displaced by the CAA.
 See Maj. op. ¶¶ 31-32;
 AEP, 564 U.S. at 424-25; Native Vill. of
 Kivalina v. ExxonMobil Corp., 696 F.3d 849, 857-58 (9th
 Cir. 2012). But I part ways with them on their view that the
 relevance of federal common law to matters covered by the CAA
 has taken its last breath. See Maj. op.
 
 45
 
 ¶ 32. Following Congress's passage of the CAA, the
 logic that sparked federal common law continues to be alive
 and kicking.
 
 
          ¶97
 That rationale was not abruptly rendered irrelevant when
 Congress passed the CAA, and the majority points to no
 binding authority that dictates otherwise. After all, where
 "federal common law exists, it is because state law
 cannot be used," Milwaukee II, 451 U.S. at 313
 n.7, and displacement of federal common law by a statute does
 "nothing to undermine that result," Illinois v.
 City of Milwaukee, 731 F.2d 403, 410 (7th Cir. 1984)
 ("Milwaukee III"). In the words of the
 Second Circuit, "state law does not suddenly become
 presumptively competent to address issues that demand a
 unified federal standard simply because Congress saw fit to
 displace a federal court-made standard with a legislative one
 ...." City of New York, 993 F.3d at 98.
 
 
          ¶98
 Consequently, the question before us now is not whether
 federal law preempts state law, as the majority
 concludes, but rather whether federal law
 "authorizes resort to state law."
 Milwaukee III, 731 F.2d at 411 (emphasis added).
 
 
          ¶99
 Critically, our Supreme Court has explained that when courts
 deal with an area traditionally governed by federal law,
 "there is no beginning assumption that
 concurrent regulation by the [s]tate is a valid exercise of
 its police powers"; instead, "we must ask whether
 the local laws in question are consistent with the federal
 statutory structure." United States v. Locke,
 529 U.S. 89, 108 (2000)
 
 46
 
 (emphasis added). This alteration of the typical ordinary
 preemption analysis (from preemption of state law to
 authorization of state law) makes sense because the
 presumption that a state-law cause of action is not preempted
 is only warranted in "a field which the [s]tates have
 traditionally occupied." Buckman Co. v.
 Plaintiffs' Legal Comm., 531 U.S. 341, 347 (2001)
 (quoting Rice, 331 U.S. at 230).
 
 
          ¶100
 In arguing that the correct analysis is one of ordinary
 statutory preemption, the majority points to a sentence from
 AEP: "In light of our holding that the [CAA]
 displaces federal common law, the availability vel
 non of a state lawsuit depends, inter alia, on
 the preemptive effect of the [CAA]." Maj. op. ¶ 30
 (alterations in original) (quoting AEP, 564 U.S. at
 429). However, not only did the Supreme Court never actually
 conduct such an analysis in AEP (because the parties
 had not briefed the issue), id., it seemed to use
 the term "preemptive effect" in a more general
 sense than the majority perceives, i.e., merely to make the
 unremarkable observation that the CAA, not federal common
 law, would determine the availability of state-law claims.
 
 
          ¶101
 The Supreme Court in Ouellette used the idea of
 preemption in a similarly general sense. In fairness, the
 majority, Maj. op. ¶ 54, correctly notes that the
 Ouellette Court framed the question presented as
 "whether the [CWA] pre-empts a common-law
 nuisance suit filed in a Vermont court under Vermont law,
 when the source of the alleged injury is located in New
 York." Ouellette, 479 U.S. at 483
 
 47
 
 (emphasis added). Significantly, however, when it actually
 analyzed the effect of the CWA, the Supreme Court concluded
 that, "[i]n light of [the] pervasive regulation [of the
 CWA] and the fact that the control of interstate
 pollution is primarily a matter of federal law, it is
 clear that the only state suits that remain available are
 those specifically preserved by the Act."
 Id. at 492 (emphases added) (citing Milwaukee
 I, 406 U.S. at 107).
 
 
          ¶102
 In other words, while reviewing the CWA's
 "regulation of water pollution," which is similar
 in comprehensiveness to the CAA's regulation of air
 pollution, the Supreme Court considered federal law's
 preeminent role in controlling interstate pollution.
 Id. at 500; see also Bell v. Cheswick Generating
 Station, 734 F.3d 188, 196-97 (3d Cir. 2013) (describing
 the similarities between the CWA and CAA and applying
 Ouellette's holding in the CAA context). And the
 Court ultimately considered whether the CWA expressly
 "allow[ed] [s]tates" to impose effluent standards
 on their own point sources after the CWA displaced federal
 common law. Ouellette, 479 U.S. at 497 (answering
 the question in the affirmative). Thus, regardless of the
 label placed on Ouellette's analysis, in
 practice it read more like an authorization analysis than one
 of ordinary preemption. If it looks like an authorization
 analysis, swims like an authorization analysis, and quacks
 like an authorization analysis, then it probably is an
 authorization analysis.
 
 48
 
          ¶103
 I'm not alone in this reading of Ouellette. I
 have good company: The Second Circuit came to the same
 conclusion when the City of New York brought state-law tort
 claims similar to those raised by Boulder here. City of
 New York, 993 F.3d at 99. After determining that the
 claims "would regulate cross-border emissions" and
 that federal common law had been displaced by the CAA, the
 court looked to whether the CAA "authorize[d]
 the type of state-law claims the City [sought] to
 prosecute." Id. at 93, 95, 99 (emphasis added);
 see also Mayor &City of Baltimore v. BP P.L.C.,
 No. 24-C-18-004219 (Cir. Ct. for Baltimore City, Md. July 10,
 2024) (unpublished order) (following the reasoning of
 City of New York). The Second Circuit was spot-on.
 
 
          ¶104
 Still, as additional support for their position, the
 majority, Maj. op. ¶¶ 31, 46, and Boulder cite
 several federal appellate cases that have conducted a
 complete preemption inquiry and held that "state-law
 claim[s] for public nuisance do[] not arise under federal
 law" for purposes of federal-question jurisdiction.
 City of Oakland, 969 F.3d at 901, 907-08; see,
 e.g., Rhode Island v. Shell Oil Prods. Co., 35
 F.4th 44, 57-58 (1st Cir. 2022); Mayor &City Council
 of Baltimore v. BP P.L.C., 31 F.4th 178, 206 (4th Cir.
 2022). But these cases are inapposite: The question before
 those courts was whether they had federal-question
 jurisdiction in the removal context given the well-pleaded
 complaint rule. They did not conduct an ordinary preemption
 analysis, much less determine whether or how ordinary
 preemption applies in the
 
 49
 
 non-removal context. See, e.g., City of
 Oakland, 969 F.3d at 907 n.6 ("We do not address
 whether [federal] interests may give rise to an affirmative
 federal defense because such a defense is not grounds for
 federal jurisdiction.").
 
 
          ¶105
 Accordingly, federal case law does not support the
 majority's application of an ordinary preemption analysis
 that treats historical federal common law as though it never
 existed.[3] In my view, the majority errs in asking
 whether the CAA preempts Boulder's state-law claims
 instead of whether the CAA affirmatively authorizes those
 claims.
 
 
          III.
 The CAA Does Not Affirmatively Authorize Boulder's Claims
 Pertaining to Interstate Emissions
 
 
          ¶106
 Like the district court, the majority fails to identify a
 single provision within the CAA that affirmatively authorizes
 state-law claims. None exists.
 
 50
 
          ¶107
 The CAA is a complex, comprehensive statutory scheme with a
 "cooperative federalis[t]" framework: The
 Environmental Protection Agency ("EPA") has primary
 regulatory responsibility, but states have
 substantial implementation and enforcement roles.
 Connecticut v. EPA, 696 F.2d 147, 151 (2d Cir.
 1982); see also City of New York, 993 F.3d at 99.
 So, while states have important parts to play in the
 statutory scheme, injecting themselves into the
 regulatory work Congress has exclusively assigned to
 the EPA isn't one of them.
 
 
          ¶108
 The majority nevertheless posits that states retain
 regulatory authority through state implementation plans
 ("SIPs"). Maj. op. ¶ 41. But that's a
 stretch. Any role the states have vis-a-vis SIPs is clearly
 delineated, supervised, and overseen by the EPA. As part of
 its responsibility over the public's health and welfare,
 Congress has designated the EPA-and only the EPA-to
 promulgate national ambient air quality standards for the
 EPA's selected pollutants. 42 U.S.C. §§
 7408(a), 7409. The EPA has several other roles under the CAA,
 including promulgating standards related to motor vehicle
 emissions. 42 U.S.C. § 7521.
 
 
          ¶109
 Nowhere does the CAA give states national regulatory
 authority. Indeed, under the CAA, states have zero
 responsibility for the promulgation of national environmental
 standards. Instead, each state is required to submit SIPs
 
 51
 
 "providing] for implementation, maintenance, and
 enforcement" of the EPA's federal standards
 within that state. 42 U.S.C. §
 7410(a)(1).[4]
 
 
          ¶110
 The CAA's two savings clauses offer no safe harbor to
 Boulder's state-law claims. The first savings clause (the
 CAA's citizen-suit provision), 42 U.S.C. § 7604(e),
 provides that "[n]othing in this section shall restrict
 any right which any person (or class of persons) may have
 under any statute or common law to seek enforcement of any
 emission standard or limitation or to seek any other
 relief." The second savings clause states that,
 "[e]xcept as otherwise provided, . . . nothing in this
 chapter shall preclude or deny the right of any [s]tate or
 political subdivision thereof to adopt or enforce (1) any
 standard or limitation respecting emissions of air pollutants
 or (2) any requirement respecting control or abatement of air
 pollution." 42 U.S.C. § 7416. There is a caveat
 accompanying the latter clause: A state or subdivision
 "may not adopt or enforce any emission standard or
 limitation which is less stringent than the [federal]
 standard or limitation." Id.
 
 52
 
          ¶111
 Nearly identical provisions in the CWA have been narrowly
 interpreted to only allow aggrieved individuals to bring
 "a nuisance claim pursuant to the law of the
 source [s]tate," thereby barring a nuisance
 claim "under an affected [s]tate's law."
 Ouellette, 479 U.S. at 495, 497. The Supreme Court
 in Ouellette reasoned that interpreting the savings
 clauses in this way "would not frustrate the goals of
 the CWA" because (1) it would not "disturb the
 [CWA's] balance among federal, source-state, and
 affected-state interests," and (2) it would
 "prevent[] a source from being subject to an
 indeterminate number of potential regulations."
 Id. at 498-99. Because this suit is an attempt to
 apply Colorado law to activities in other states
 allegedly creating pollution, Ouellette's
 reasoning is applicable.[5] See Bell, 734 F.3d at 196-97
 (finding "no meaningful difference between the [CWA] and
 the [CAA] for the purposes of [a] preemption analysis").
 Thus, the savings clauses cannot confer the requisite
 authority on Boulder to proceed with this litigation. See
 City of New York, 993 F.3d at 99-100 (similarly
 concluding that the CAA savings clauses did not authorize the
 state-law claims at issue there).
 
 53
 
          ¶112
 Lastly, I am aware of the provision in the CAA stating
 "that air pollution prevention . . . and air pollution
 control at its source is the primary responsibility of
 [s]tates and local governments." 42 U.S.C. §
 7401(a)(3). But this is simply part of the congressional
 findings and purpose, which cannot bestow binding,
 affirmative authorization on Boulder to pursue its claims.
 Moreover, this provision is nothing more than an
 acknowledgment of a state's traditional responsibility to
 control sources of pollution in its own jurisdiction. Cf.
 Ouellette, 479 U.S. at 497. The structure of the
 statutory scheme supports this interpretation. See
 Charnes v. Boom, 766 P.2d 665, 667 (Colo. 1988)
 ("[W]e must read and consider the statutory scheme
 as a whole to give consistent, harmonious and sensible
 effect to all its parts." (emphasis added)). While
 states have significant implementation and enforcement roles
 as to in-state sources of pollution, nowhere does the CAA
 authorize them to independently regulate or otherwise control
 out-of-state sources of pollution.
 
 
          ¶113
 In short, Boulder has not identified any adequate source of
 authority in the CAA to permit the claims as they relate to
 interstate pollution. My colleagues in the majority have not
 either. That's because there is none. Thus, these claims
 should not be allowed to proceed.
 
 54
 
          IV.
 State Law Is Similarly Incompetent to Address Claims
 Pertaining to International Emissions
 
 
          ¶114
 Boulder's broad claims extend to conduct outside of the
 United States. But state law is no more competent to address
 this aspect of the claims. State law is preempted by federal
 law when it comes to international emissions under both
 foreign affairs field preemption and conflict preemption. I
 discuss each in turn.[6]
 
 
          ¶115
 Due to "the supremacy of the national power in the
 general field of foreign affairs, . . . [o]ur system of
 government . . . imperatively requires that federal power
 in the field affecting foreign relations be left entirely
 free from local interference." Hines v.
 Davidowitz, 312 U.S. 52, 62-63 (1941) (emphasis added).
 Therefore, "[state] regulations must give way if they
 impair the effective exercise of the Nation's foreign
 policy," "disturb foreign relations," or
 "establish [a state's] own foreign policy."
 Zschernig v. Miller, 389 U.S. 429, 440-41 (1968). It
 follows that, under foreign affairs field preemption,
 "state action with more than [an] incidental effect
 
 55
 
 on foreign affairs is preempted, even absent any affirmative
 federal activity in the subject area of the state
 law"-i.e., "without any showing of conflict."
 Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 398
 (2003) (relying on Zschernig, 389 U.S. at 432). This
 is true notwithstanding "the absence of any treaty,
 federal statute, or executive order." Movsesian v.
 Victoria Versicherung AG, 670 F.3d 1067, 1072 (9th Cir.
 2012) (relying on Zschernig, 389 U.S. at 440-41).
 
 
          ¶116
 State claims seeking to impose damages on parties for their
 emissions outside of the United States necessarily
 "disturb foreign relations," Zschernig,
 389 U.S. at 441, or, at minimum, impact foreign affairs in
 more than an incidental way, Garamendi, 539 U.S. at
 398, because they effectively regulate extraterritorial
 activities, potentially upset the United States
 government's current or future "carefully balanced
 scheme of international cooperation on a topic of global
 concern," and "risk jeopard[y] [to] our
 nation's foreign policy goals," City of New
 York, 993 F.3d at 103. Thus, "even absent any
 [current] affirmative federal activity" related to
 climate change, Boulder's claims will impermissibly
 result in "more than [an] incidental effect on foreign
 affairs." Garamendi, 539 U.S. at 398.
 
 
          ¶117
 The majority suggests that preemption of a state law under
 the foreign affairs field preemption doctrine may only occur
 when the state is not "addressing a traditional state
 responsibility." Maj. op. ¶ 64 (quoting
 Movsesian, 670 F.3d at 1072). Be that as it may,
 this case does not involve an area of traditional state
 
 56
 
 responsibility. Movsesian, 670 F.3d at 1072; Maj.
 op. ¶¶ 65-66. As discussed above, redress of
 interstate and international air pollution has traditionally
 been governed by federal common law.
 
 
          ¶118
 Regardless, conflict preemption also applies because this is
 not an area of foreign affairs where there has been a
 complete absence of federal activity. As mentioned, the CAA
 itself touches on the issue of international pollution with
 one minor provision allowing the EPA to prevent pollution
 emanating from the United States from endangering the public
 health and welfare of a foreign country if that country
 provides reciprocal rights to the United States. 42 U.S.C.
 § 7415. This provision evinces our federal
 government's consideration of international air
 pollution, as well as its concomitant judgment as to how much
 extraterritorial regulation was advisable in light of the
 complex economic, environmental, and political tradeoffs
 involved. Further evidence of that judgment can be found in
 international agreements pertaining to climate change that
 our federal government has, at various points in time, either
 joined or refrained from joining. See, e.g., Exec.
 Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021)
 (rejoining the Paris Agreement under the United Nations
 Framework Convention on Climate Change); Exec. Order No.
 14,162, 90 Fed. Reg. 8455 (Jan. 20, 2025) (ordering
 withdrawal from the Paris Agreement).
 
 57
 
          ¶119
 In sum, because our federal government has clearly balanced
 many different interests in formulating its foreign policy on
 air pollution, it makes little sense to allow international
 regulation through the types of state claims Boulder has
 brought. By giving Boulder the nod to proceed with its
 claims, the majority risks impeding our federal
 government's judgment as to how to approach air pollution
 in the international sphere.
 
 
          V.
 Allowing These and Similar Claims to Proceed Will Create a
 Chaotic Patchwork of Local Standards
 
 
          ¶120
 A patchwork of standards formulated by local governments
 throughout the country to regulate GHG emissions is not
 capable of effectively addressing interstate air pollution.
 Such local regulation will invite chaos. Fossil fuel
 companies will potentially face many suits based on numerous
 standards, which will cause "vagueness" and
 "uncertainty," Ouellette, 479 U.S. at 496,
 and make it "virtually impossible to predict the
 standard" for a lawful interstate emission,
 Milwaukee III, 731 F.2d at 414. Think of how
 difficult it will be to administer such a system: How will
 courts isolate each company's contribution to each
 alleged climate harm? The federal government's interest
 in avoiding regulatory chaos through a uniform standard is
 why federal common law existed in the first place, and that
 interest is even more prominent today. The legislature, in
 crafting the CAA, certainly didn't intend to downplay it.
 
 58
 
          VI.
 Conclusion
 
 
          ¶121
 Boulder is not its own republic; it is part of Colorado and,
 by extension, of the United States of America. Consequently,
 while it has every right to be environmentally conscious, it
 has absolutely no right to file claims that will both
 effectively regulate interstate air pollution and have more
 than an incidental effect on foreign affairs. And because
 Boulder has brought just such claims in this case, I cannot
 join the majority. I would instead dismiss Boulder's
 claims.
 
 
          ¶122
 Given the number of local municipalities throughout the
 country that have already brought claims like those advanced
 by Boulder, given that more and more municipalities are
 joining this trend, and given further that a number of courts
 have now ruled that such claims may be prosecuted, I
 respectfully urge the Supreme Court to take up this
 issue-whether in this case or another one. My colleagues in
 the majority, like other courts, interpret Supreme Court
 precedent as permitting Boulder's claims. Respectfully, I
 believe that they misread those cases.
 
 
          ¶123
 I'm concerned that this decision will contribute to a
 patchwork of inconsistent local standards that will beget
 regulatory chaos. To borrow from Fleetwood Mac's old hit
 song, the message our court conveys to Boulder and other
 Colorado municipalities today is that "you can go your
 own way" to regulate interstate and international air
 pollution. Fleetwood Mac, Go Your Own Way,
 on Rumours (Warner Bros. Records Inc. 1977). In our
 indivisible nation, that just can't be right. I
 respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] I use "Boulder" to
 collectively refer to the plaintiffs, the City of Boulder and
 the County Commissioners of Boulder County.
 
 
 [2] This suit cannot be construed to be
 regulating only in-state conduct, which has not been
 historically covered by federal common law.
 
 
 [3] The majority, Maj. op. ¶ 52,
 quotes Virginia Uranium, Inc. v. Warren, 587 U.S.
 761, 767 (2019), for the proposition that "[i]nvoking
 some brooding federal interest or appealing to a judicial
 policy preference should never be enough to win preemption of
 a state law" because "a litigant must point
 specifically to 'a constitutional text or a federal
 statute' that does the displacing or conflicts with state
 law." (Quoting Puerto Rico Dep't of Consumer
 Affs. v. Isla Petrol. Corp., 485 U.S. 495, 503 (1988)).
 But Virginia Uranium was a plurality opinion. Of
 course, a "plurality opinion . . . [does] not represent
 the views of a majority of the Court." CTS Corp. v.
 Dynamics Corp. of Am., 481 U.S. 69, 81 (1987). As such,
 it is not binding precedent. Id. At most, it is a
 "point of reference for further discussion."
 Texas v. Brown, 460 U.S. 730, 737 (1983) (plurality
 opinion). Besides, as mentioned, the ordinary preemption
 analysis employed by the Court in Virginia Uranium
 is not the appropriate test here.
 
 
 [4] SIPs must include, among other things,
 "enforceable emission limitations and other control
 measures," as well as provisions prohibiting any
 emissions that significantly contribute to the air pollution
 problems of a downwind state. 42 U.S.C. § 7410(a)(2)(A),
 (D). If a given SIP submission or proposed revision
 "meets all of the applicable requirements" of the
 CAA, the EPA must approve it. 42 U.S.C. § 7410(k)(3).
 But if a state fails to submit or implement an adequate SIP,
 the EPA must create a Federal Implementation Plan. 42 U.S.C.
 § 7410(c).
 
 
 [5]1 would not rule out the possibility
 that Boulder could bring suit under Colorado law to recover
 damages allegedly caused by emissions resulting from the
 energy companies' activities in Colorado.
 See Milwaukee II, 451 U.S. at 328 (contemplating
 that states may be able to adopt more stringent limitations
 than the CWA "through state nuisance law" and
 "apply them to in-state discharges"). But
 that's a far, far cry from what Boulder is seeking to do
 here - with the majority's blessing, no less.
 
 
 [6] To the extent that Boulder's
 claims pertain to international emissions, they require
 review under a different methodology than interstate
 emissions. First, of course, preemption related to
 international matters and ordinary preemption implicate
 different analytical frameworks. Second, the CAA did not
 displace federal common law in the international arena. Apart
 from one minor provision allowing reciprocal arrangements
 with foreign countries, see 42 U.S.C. § 7415,
 the CAA is virtually silent about its extraterritorial reach,
 and "unless a contrary intent appears, [a statute] is
 meant to apply only within the territorial jurisdiction of
 the United States." City of New York, 993 F.3d
 at 100 (quoting Morrison v. Nat'l Austl. Bank
 Ltd., 561 U.S. 247, 255 (2010)).
 
 
 ---------